Darnell WILLIAMS Petitioner,

v.

Rondle ANDERSON, Superintendent,
Indiana State Prison,
Respondent.

No. 3:99CV0570.

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 19, 2001.

Juliet Marie Yackel, Chicago, IL, for plaintiff.

Stephen E. Eberhardt, Crestwood, IL, for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, Darnell Williams, was convicted of murder in a state court trial conducted in Lake County, Indiana, and was sentenced to death by the judge conducting that trial upon the recommendation of the jury that heard the case. The within petition was filed by counsel in this Court on May 12, 2000 and oral argument was heard in Lafayette, Indiana on April 5, 2001. Additionally, supplemental simultaneous briefs were filed on July 23, 2001. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Rouster v. State,* 600 N.E.2d 1342 (Ind. 1992), and *Williams v. State,* 706 N.E.2d 149 (Ind.1999), *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). This petitioner is now confined on death

row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

The evidence presented at trial developed the following facts regarding the murders of John and Henrietta Rease. As neither Darnell Williams nor Gregory Rouster, his co-defendant, have testified or otherwise made statements on the record regarding the facts of the case, the facts elicited at trial are the best description of the events of August 12, 1986.

On August 12, 1986, Jack Baumer, a child welfare caseworker employed by the Lake County Department of Public Welfare, ran into one of his former charges, Gregory Rouster, at a drug store in Gary. T.R. 812.[1] Baumer had worked on Rouster's case while he was placed at the Gibault School for Boys in Terre Haute, and had later placed Rouster in the home of John and Henrietta Rease, 2430 Jennings Street in Gary, for his last few months in the care of the state, from November 1985 through his eighteenth birthday on February 7, 1986.[2] T.R. 811. During their encounter on August 12, 1986, Rouster asked Baumer if the Reases had received a clothing allowance for him from the state during their brief foster care relationship. T.R. 818. When Baumer responded that the Reases had received a small amount of clothing allowance, approximately five to six dollars per month, Rouster told him that he had not received any clothing and that he was going to get the money from the Reases. T.R. 819–20.

Eugene Powell, a young man who lived across the street from the Reases, was outside with his friends at approximately 8:30 or 9:00 p.m. on the evening of August 12, 1986. T.R. 858–59. Powell saw Rouster, Rouster's girlfriend, Tina, a friend of Rouster's, and another girl coming down the street towards the Powell and Rease homes. Powell knew Rouster from his time as a foster child in the Rease home. T.R. 860–62. Rouster stopped at the Hicks home and inquired if a Tony was home. When told he was not, the four continued on to the Rease home. T.R. 866–68. Powell watched Rouster and Tina go into the Rease home while the other two stayed outside. T.R. 868–69. Powell and his friends walked to the corner of Jennings and 25th Avenue, then turned around and walked back, and as they were walking, they heard what sounded like two firecrackers. T.R. 869–71. Powell then saw Rouster's friend using a cigarette lighter to look for something on the ground. T.R. 871–72. Powell and his friends saw Rouster come out of the house and go to the garage. T.R. 878–79. Powell and a friend, Demond, walked up the Reases' driveway, but when they heard Rouster say, "who's up in here, we shoot," they turned around and went back across the street. T.R. 880. Powell and his friends again walked down the street, and Powell heard three more firecrackers, at which time they returned to Powell's house. T.R. 881–82. Powell noticed that all the lights were off in the Reases' house except for the television, and Powell saw a shadow pointing inside the house. T.R. 883. Powell and his friends again walked down the street, where they heard two more firecracker sounds, and they went into a friend's house. T.R. 884. Powell

---

1. This court will refer to the record from the trial as T.R. ___, and to the record from the post-conviction proceedings as P.C.R. ___.

2. This court will refer to the victims by the correct spelling of their name, Rease. The trial transcript consistently misspells their name as Reese, and the court will use that spelling when quoting the record, but will otherwise use the correct spelling.

eventually returned home to see if his father had arrived home; as he did, he saw Rouster standing in the Reases' driveway talking to Tina. T.R. 886–87. Powell saw his father and started running for his father's car, but as he ran, he heard Rouster state to Tina "I killed the motherfuckers." T.R. 891–92. Powell then saw a police car pull up to where Rouster and Tina were talking, and he saw Rouster pointing down the street. The police then pulled away and stopped at a different house down the block. T.R. 893. As Powell and his father drove away, they heard another firecracker sound while Rouster and Tina were still in the driveway. T.R. 893–94.

Jamal Pope was with Powell on August 12, 1986, and he also recognized Rouster and Tina that evening. When Pope and Powell were walking back from 25th Avenue the first time, Pope also noticed the person looking for something with a cigarette lighter, and he saw that person admitted into the Rease home. T.R. 1829–31. Pope then heard some shots while sitting on Powell's ledge. T.R. 1831. He saw Rouster leave the house and walk towards the back of the house, then reenter the house, after which he heard more shots. *Id.* Pope then went with Powell to call Powell's father, during which time he heard more shots. T.R. 1832. Finally, he ran to Powell's father's car, at which time he saw Rouster talking to Tina, asking her "do you still love me?" *Id.* Pope saw Rouster and Tina redirect the police car and he heard one more shot from inside the Rease home, and then he left the scene. T.R. 1832–33. Pope identified Rouster and Tina at trial as the people he had seen, and further identified Darnell Williams as Rouster's friend who was looking for something with the lighter. T.R. 1837–39.

Clyde Cunningham went to the Rease home shortly before 9:00 p.m. on the evening on August 12, 1986 to purchase a pack of cigarettes from their small store. T.R. 1177. As Cunningham approached the store entrance, a young woman approached him and told him the store was closed. T.R. 1184. Cunningham did not try to go into the store, although he noticed that the wire gate was still open and the lights were still on in the house. T.R. 1185. Approximately five to ten minutes later, Cunningham heard what sounded like gunfire coming from the direction of the Rease home. T.R. 1187.

Demond Ligon, another young resident of the neighborhood, was with his friends, Eugene Powell, Jamal Pope, and Jimmy Gray, on the evening of August 12, 1986. T.R. 1785. Ligon testified that he walked to 25th Avenue with his friends, where he heard two "pops." T.R. 1788. When the group walked back toward the Rease home, Ligon saw Edwin Taylor, another foster child of the Reases, under a car in the driveway next to the Reases' house, and he saw Rouster's friend looking for something in the Reases' yard with a lighter. T.R. 1787. Ligon and Powell began walking toward the Reases' driveway, at which time Ligon saw Rouster standing by the garage and heard him say "come out or I'll shoot." T.R. 1790. Ligon and Powell then returned across the street, where he saw Rouster's friend bang on the front door of the Reases' home and be admitted. T.R. 1794. Shortly after that, Ligon heard more "pops" coming from the house, and the group ran to Ligon's home to use the phone. T.R. 1795–96. Ligon identified Rouster in court, but not the others. T.R. 1798. Ligon did state that Rouster's friend was wearing Hawaiian shorts that night. T.R. 1799.

Jimmy Gray was another of the group of young people outside on the night of August 12, 1986 who saw Rouster approach the Rease home with another man and two

women. T.R. 1515–17. Gray walked with his friends to 25th Avenue, and as they returned, he heard what sounded like two shots. T.R. 1521. Gray then saw a boy on the ground in front of the Reases' home, looking for something with a lighter and saying something about his shells. T.R. 1523–24. Gray went inside his home, where he heard more shots. T.R. 1525. Gray identified Rouster as one of the people present that evening. T.R. 1527. Gray identified the other boy as wearing a red shirt, but did not otherwise recognize him. T.R. 1527–28.

Lelia Gray, Jimmy's mother, was at home on the evening of August 12, 1986. T.R. 1540. Mrs. Gray heard a lot of noise and cursing outside her home that evening. *Id.* She saw two boys wrestling in the Reases' driveway, with one boy yelling that he wanted his share. T.R. 1541–42. She heard a young lady dressed in white ask for bus fare and one of the boys told her to leave. T.R. 1543–44. Mrs. Gray saw the two boys at the Reases' front door, trying to push their way in, and she noticed that one boy had a gun in his back pocket. T.R. 1545. She saw the two boys enter the home and then heard what sounded like gunshots. T.R. 1546. She later saw one boy and the girl in the driveway, where she heard the girl ask the boy why he did what he did, and heard the boy say that he killed the motherfuckers and that the girl should go home, although the girl protested that she did not have bus fare. T.R. 1557–58. Mrs. Gray saw a police car pull up to the Reases' home and saw the boy and girl tell the police that the disturbance was down the block; she then watched the boy and girl walk to the back of the Reases' home and she heard one more shot. T.R. 1559–61.

Gloria Williams, the Reases' next-door neighbor, was at home on the evening of August 12, 1986 as well. T.R. 1230. After receiving a telephone call at approximately 9:15 p.m., Williams heard a commotion going on at the Reases' home, followed by a loud bang and a scream. T.R. 1231. She then heard another bang, things being thrown around in the bedroom, and a voice saying "get it, you know where it is, go get it." T.R. 1231. She then heard more shots and called the police. T.R. 1235, 1239. She noticed a man and a woman in front of the Rease home arguing, with the boy saying "you don't love me" and the girl saying "yes, I do. You know I love you." T.R. 1239–41. Williams then heard another voice tell the boy to take her home. T.R. 1241–42. Williams testified that the voice of the boy who was arguing was the same as the voice she heard in the Reases' bedroom. T.R. 1243.

Officer Rita Dorsey, of the Gary Police Department, was the officer sent astray by Rouster on August 12, 1986. T.R. 962–64. Dorsey responded to a radio call of shots fired and found a black male and a black female standing at the door of the home "casually chatting." T.R. 964. The girl approached the car and told her that it might have been a different house down the street, as there was no disturbance at that location. T.R. 968. Dorsey and her partner went to the other house and talked with a woman there. After the conversation, Dorsey heard a shot which she thought came from the next block, so she returned to the patrol car and she and her partner circled the block. T.R. 969–70. As they circled the block, they were flagged down by a young man named Derrick hiding in a weeded area, who took them back to the Reases' home. T.R. 971–72. Dorsey entered the home with her fellow officers, searched the home, and found the bodies of a black male and black female on the floor of a bedroom in complete disarray. T.R. 975.

Gary bus driver Donna Thomas was working the evening shift on August 12, 1986. She picked up two girls and two boys at 21st and Broadway shortly after starting her route at 8:05 p.m. T.R. 1133. She identified Gregory Rouster as having worn a white shirt, black Kangel hat and flowered Hawaiian pants and Darnell Williams as having worn all dark clothes. T.R. 1138–39, 1152–53. The four were somewhat rowdy and she noticed that they all four got off at 21st and Hendricks, approximately six to eight minutes after boarding. T.R. 1134–36, 1160. After her lunch break, around 9:20 p.m., the young man she identified as Rouster and the young woman she identified as Tina, or Theresa Newsome, ran across the street at 21st and Chase and boarded the bus. T.R. 1162. As Thomas crossed the intersection of 25th and Chase, she noticed an Indiana State Police car, and she saw Rouster and Newsome crouch down in their seats. T.R. 1164. The two then got off the bus at 21st and Broadway. T.R. 1165.

Rodney Means, an Indiana State Police Trooper, heard the Gary police report and met with the officers at the Rease residence. He then continued his regular patrol. T.R. 992–94. As he approached 21st and Broadway, he saw a boy and a girl running toward a bus there, and he saw that they matched the description of two of the suspects. T.R. 994–95. Thus, he followed the bus south to 41st and Broadway, where the pair exited the bus, at which time he parked his car and approached the pair. T.R. 995–96. The girl said they had boarded at 11th and Broadway, and the boy told Trooper Means that they were coming from the east side of Gary, but then stated they came from Porter Street, which is on the far west side of Gary. Means continued to question the pair, telling them he had seen them board the bus at 21st and Broadway. TR. 1009–1010. Means asked the boy what was bulging in

his shirt pocket, and the boy answered bullets or ammunition. When the boy handed the ammunition to him, Means saw what appeared to be 20 or more bullets. T.R. 1010–1012. Means walked to the rear of the boy and noticed red spots on his white shirt. T.R. 1081–82. Means transported the boy back to the Reases' home, and then to the Gary City Jail. T.R. 1083–84. Means identified Rouster as the individual he transported that night, and further identified Theresa Newsome as the girl with Rouster. T.R. 1085–87. Another Indiana State Police Trooper, Al Brown, had joined Means at 41st and Broadway, and Brown read Rouster and Newsome their Miranda rights and then transported Newsome back to the Reases' home. T.R. 1199–1201.

Lake County Police Officer Timothy Lukasik also responded to the dispatch at the Reases' home. T.R. 1483. He obtained a description of the suspects and began searching. T.R. 1484. Approximately three blocks from the Reases' home, Lukasik saw an individual dressed in a red tee shirt, Hawaiian shorts and tennis shoes walking south on Chase Street. Lukasik parked the car next to the individual and started to get out, but the individual started running. T.R. 1485–86. The individual got away, and Lukasik started back towards his station, crossing an overpass over I–80. T.R. 1486. He then determined he had more time and went back towards the scene. As he recrossed the overpass, he saw the subject walking south over the overpass. T.R. 1487.

Lukasik called for backup and stayed on top of the overpass watching to see if the subject would come out from under the overpass. T.R. 1488–89. When the backup arrived, two officers went to the west side of the overpass while Lukasik and another officer went into a weeded area on the east side. T.R. 1492. Lukasik then

saw the subject crouched behind a barricade in the median of I–80. Lukasik ran out to the barricade, saw that the subject had gone back to the side of the road, and ran back across the lanes of traffic behind the subject, catching him in the grass at the side of the road. T.R. 1493–95. At trial, Lukasik identified the individual he had arrested as Darnell Williams. T.R. 1500. Lukasik then took Williams to the Gary Police Department. T.R. 1499. Lukasik testified that he obtained a leather pouch from Williams which contained money and a .30 caliber live round of ammunition. T.R. 1500–01. Lukasik turned the property over to Detective Joe Starkes of the Gary Police Department. T.R. 1504.

Williams was transferred to the Lake County Jail at some time after his arrest and detention in the Gary Police Department. Once transferred, his clothes were taken from him by the clothing officer in exchange for jail clothing. T.R. 1844–45. Williams' clothes were then stored at the Lake County Jail until requested by the Lake County Prosecutor's Office on August 21, 1986. T.R. 1845. The Lake County Prosecutor's Office stored the clothing in the same plastic bag in which it had been placed at the jail in their evidence locker. T.R.1937–39. On September 24, 1986, the bag of clothing was turned over to Kathy Caccavallo of the Lake County Sheriff's Crime Lab. T.R.1940. At trial, Caccavallo made no mention of the bag of clothing, either in terms of its storage for chain of custody or in terms of having performed any tests upon the clothing. T.R. 1601–24.

Michael Reilly, an evidence technician with the Lake County Police Department, collected several items laying in the driveway of the Rease home on the night of August 12, 1986. T.R. 1624, 1626. He was able to lift fingerprints from several items, including various packs of cigarettes lying in the driveway. T.R. 1630–31. Robert Piskoty, a fingerprint examiner for the Lake County Police Department later established that prints on five of the packs were those of Rouster. T.R. 1707–79. No prints were attributed to Williams.

Ronald Lach, Lake County Sheriff's Crime Laboratory evidence technician, searched the Rease home for evidence on the night of August 12, 1986. T.R. 1268–70. As Lach approached the southeast bedroom, he noticed a live .32 caliber cartridge case and a quarter were lying on the floor and that the door was slightly ajar. As he pushed the door open, he saw the first victim laying with his knees bent around the door and the second victim laying wedged between the bed and dresser with her head resting on the open drawer of a nightstand. T.R. 1276–77. Lach found the bedroom to be completely ransacked and saw that the victims were covered by clothes from the drawers. He also found live .30 caliber ammunition in the doorway going into the bedroom. T.R. 1291–93. He also found two fired .32 caliber cartridge cases and two or three live rounds of .22 caliber bullets lying on the floor. T.R. 1293–94. He found two boxes of ammunition on the bed's headboard: Remington .32 caliber Smith & Wesson live rounds and Western X .25 caliber automatic live rounds of ammunition. He found two other boxes of ammunition on a nightstand: Winchester Super Western .38 caliber live rounds and Remington .32 caliber Smith & Wesson live rounds. T.R. 1294–95.

Lach found a wad of money behind the corner of the dresser and coins lying on the floor. T.R. 1309–10. He found a hole in the wall which went through the wall and into the aluminum siding. T.R. 1311–12. He also found a gouge out of the wood on the nightstand and a hole in the side of the refrigerator which was found to be

caused by a lead projectile. TR. 1313–15, 1325. Lach found two guns in the home, a .22 caliber weapon and a pellet or B.B. pistol. T.R. 1330–31. In the driveway he found a white plastic bag with money, cigarettes and loose change in it, as well as a tool box and other cigarettes on the ground. T.R. 1344–45.

Lach returned to the Rease home on August 19, 1986, at which time he found two more loose rounds of .22 caliber live ammunition and three fired .32 caliber cartridge cases in the bedroom. T.R. 1352–53. He then searched in the weeds behind the Rease home and found a .32 caliber revolver lying on the grass. T.R. 1353–55. Lach found one fired .32 caliber cartridge case inside the cylinder.

Jay Gauthier, a firearms examiner for the Lake County Crime Lab, determined that the five .32 calibers fired casings found in the bedroom were fired by the .32 caliber revolver found in the weeds behind the Rease home, as were two bullets recovered from the victims (one from each victim). T.R. 1373–77, 1687–89. The victims were both found to have been killed by bullet wounds: John Rease received one shot, which lacerated his lung, and three shots to Henrietta Rease, a non-lethal shot in her abdomen, and one shot on each side of her temple, each of which lacerated her brain. T.R. 2138–42.

Kimberly Epperson, a forensic serologist with the Indiana State Police, testified that she found dried human blood on the socks, gym shoes, vest and tee shirt recovered from Rouster, and from the shorts worn by Williams. T.R.1948–53. Epperson determined that the blood found on the shoes, socks, and vest taken from Rouster was consistent with blood taken from John Rease's body, but not consistent with the blood samples drawn from Henrietta Rease, Theresa Newsome, Williams, Rouster or Edwin Taylor. T.R.1961,

1965–66. She determined that the blood on Rouster's t-shirt was consistent with the blood of either John Rease, Henrietta Rease or Rouster, but not the others. Finally, she found that the blood found on the shorts taken from Williams was consistent with either John Rease, Henrietta Rease or Rouster, but not any of the others. T.R.1966–67. Epperson found no blood on Williams' shoes, and stated that she would have been able to detect dried blood had any been on the shoes. T.R. 1984.

The final piece of the puzzle at trial was the testimony of Derrick Bryant, another foster child of the Reases. Bryant was living at the Rease home on the night of August 12, 1986 with Edwin Taylor, another foster child, and the Reases. T.R.2018–19. Bryant saw Rouster, Williams, Newsome and Kim Toney, Williams' girlfriend, walking towards the Rease home around 9:00 p.m. Bryant knew the four from when Rouster lived with the Reases. T.R.2019–20. The four entered the home and Rouster and Mrs. Rease went to Rouster's former bedroom to talk. T.R.2021. Bryant heard Rouster say that Jack had told him he was supposed to get some money, to which Mrs. Rease responded that she didn't know anything about it. The two returned to the living room and everyone began arguing. Mrs. Rease then had everyone leave the home, although the group continued hollering outside. T.R.2023–26. Bryant heard Dee (Darnell Williams) say "I won't let her, she's doing nothing but gyping you out of the money," then heard a shot and someone running through the backyard. T.R.2026–27. Bryant heard Edwin Taylor say "you all have guns, you all go take the money," to which Rouster responded "where is the money at?" and Taylor answered, "it's on the dresser." T.R.2029–30.

Bryant started to the front room to tell the Reases what he had heard, but he saw Rouster coming through the front door and went to hide. T.R.2037. He then heard Rouster tell Mrs. Rease "I know how to act now and I don't need us to go through this because I got a gun and you got a gun." T.R.2037. Rouster then asked where the money was, and Bryant hid under the stairs by the back door. T.R.2037–39. Bryant heard Rouster say "bring both of them back here." He heard someone fall into the wall. Williams said "it's your time." Mrs. Rease said "Greg, why are you doing this?" and Rouster responded "my name ain't Greg." T.R. 2039–41. Bryant then heard a shot, followed by someone entering the kitchen, closing the side door, and then money falling to the floor. T.R.2042. Bryant heard more shots coming from inside the house, at which time he ran out the door to his friend Sam's house. T.R.2044–25. Bryant identified Rouster, Williams and Newsome as three of the four who had come to the house that night. T.R.2051–52.

Williams was arrested on the night of August 12, 1986 after having been detained by Officer Lukasik. Attorney David Schneider was appointed to represent Williams on August 15, 1986, and additional counsel Nathaniel Ruff was appointed on October 1, 1986. T.R. 21A, 35A. On January 27, 1987, counsel filed a motion for severance "for the reason that his interests, rights and his defense hereto will be prejudiced if he is tried with the remainder of the defendants herein." T.R. 50A. On the same day, Williams' counsel also moved to increase the number of peremptory challenges, to sequester the jury, to suppress certain evidence taken from Williams at the time of his arrest, for separate counsel tables, to dismiss the death penalty charge against Williams, for individual sequestration during voir dire, challenging any "death qualification" voir dire questions, and to exclude the death penalty because Williams was a non-triggerman. T.R. 51A—80A. On February 3, 1987, the court denied the motion to increase peremptory challenges, granted the motion for sequestration, granted the motion for separate defense tables, and continued the remaining motions. T.R. 88A. On February 6, 1987, the court denied the motion for severance, the motion challenging "death qualification" voir dire questions, and the motion for funds to employ experts on sentencing patterns. T.R. 95A.

The jury was selected on February 9, 1987. T.R. 99A. When Williams arrived at court that morning, he was still attired in his jail clothes because his mother had failed to deliver his street clothes. T.R. 273–74. The judge gave Williams the option of remaining in the courtroom in his blue jail dungarees or leaving the courtroom, and Williams chose to stay. T.R. 277–78. The trial began on February 10, 1987, at which time Williams' counsel waived opening argument. T.R. 809. During the state's twenty-fourth witness, Williams' counsel first discovered that the state would present evidence that serologist Kim Epperson had found blood on Williams' shorts. T.R. 1852. Despite this information, Williams' only defense witnesses were his mother, who testified about the contents of his leather pouch, and the investigator for the Lake County Public Defender's Office, who presented pictures of the Rease home. T.R. 2398–2401, 2376.

Closing arguments were made on February 16, 1987 by Nathanial Ruff. T.R. 2528. Prior to the start of closing arguments, Judge James Letsinger told the parties that if Rouster turned on Williams during his close, since Rouster was going last, the judge would place his glasses on the bench, signaling that Rouster had an

additional fifteen minutes of argument, and then the counsel for Williams and Newsome would each get fifteen minutes of rebuttal closing argument after Rouster. T.R. 2462. This occurred, and Ruff also had an opportunity for a rebuttal closing argument. T.R. 2593. The jury returned a verdict of guilty on both counts as to Rouster and Williams on February 17, 1986. P.C.R. 79.

David Schneider presented the opening argument during the penalty phase. T.R. 2708. During the penalty phase, the state presented the testimony of Edwin Taylor, who had been a co-defendant with Rouster and Williams, but who had pled guilty to robbery on the first day of voir dire. P.C.R. 55. Taylor testified that Williams had demanded that the Reases give Rouster his money and that Rouster produced a gun and fired several shots. T.R. 2730–33. Williams then took the gun from Rouster and demanded that Taylor tell them where the money was. T.R. 2736. Taylor testified that both appeared to be drunk at the time, and he claimed that Rouster had threatened to rob the Reases two or three weeks before the incident. T.R. 2743, 2753.

The state also presented testimony that identified Williams as one of three men who had participated in an home invasion. T.R. 2827–43, 2878–96. Williams was never charged with this conduct, but the state argued that it was a part of his criminal history. Williams presented mitigation evidence from his mother, his aunt, his girlfriend's mother, and his employer, all of whom testified that he was regularly employed and was kind to his family and provided for them. T.R. 2977–3017. As with the closing arguments during the guilt phase, the judge gave each side extra time, and allowed Williams a rebuttal, because they argued against each other. The jury returned a recommendation of

death for both Rouster and Williams on February 19, 1987.

At the sentencing hearing on March 20, 1987, Rouster did not present any witnesses nor did he testify. T.R. 3180. The judge sentenced Rouster to death, stating that he found only a lack of significant criminal history as a mitigating circumstance, but that he found all three alleged aggravating circumstances, i.e., that Rouster had killed each of the Reases intentionally and that he had murdered two or more people. T.R. 3326. The court then sentenced Williams to death. *Id.*

Williams appealed his conviction and sentence directly to the Indiana Supreme Court, raising on appeal the failure to sever Rouster's trial from Williams, the consideration of the unrelated uncharged robbery conduct, and the failure to prove Williams was a triggerman. Williams was represented on appeal by attorneys Nathaniel Ruff and Daniel Bella from the appellate public defender's office for Lake County. Ruff had also served as Williams' counsel at trial.

Chief Justice Shepard, writing for the majority, addressed those issues in his opinion of October 16, 1992. On the issue of severance, the court found that because Williams' motion only stated that "his interests, rights and his defense hereto [would] be prejudiced if he [were] tried with the remainder of the defendants herein," the motion was properly denied. *Rouster v. State,* 600 N.E.2d 1342, 1346 (Ind.1992) (quoting T.R. 50). Because he failed to renew the motion at the close of evidence, the court found it waived on appeal. 600 N.E.2d at 1346. On the issue of the prior uncharged robbery, which was proffered during the penalty phase to rebut the mitigating factor of "no significant history of prior criminal conduct," the court found that because mitigating factors need only be proven by a preponderance of

the evidence, and because the jury need not make its weighing of the aggravating and mitigating circumstances beyond a reasonable doubt, there are no due process violations in "offering evidence of independent crimes to disprove the lack of significant prior criminal conduct." *Id.* at 1349. Finally, the court found that "Williams' participation in the felonies was major and that his conduct displayed reckless indifference to human life. Thus, the State has demonstrated the level of culpability required by the Eighth Amendment." *Id.* at 1350. Justice DeBruler dissented as to the penalty, noting that the trial court had found one mitigating circumstance, that of no prior criminal conduct, and that he would add mitigating value to Williams' regular employment and aid to his family, thus balancing the scale and requiring the sentence of death to be set aside. *Id.* at 1353.

Williams then filed his initial petition for post-conviction relief on August 26, 1993, represented by attorneys Ann Pfarr and Juliet Yackel of the Indiana Public Defender's Office. P.C.R. 86. Williams raised the following claims in his initial petition: that he was denied effective assistance of counsel due to the indigent defense system in Lake County, that he was denied effective assistance of counsel due to the prejudicial acts and omissions of his court-appointed trial counsel, that he was denied effective assistance of counsel due to the prejudicial acts and omissions of his court-appointed appellate counsel, that his due process rights were violated by the consideration of impermissible evidence at the sentencing hearing, and that he was denied his right to a fair review of his sentence by the Indiana Supreme Court. P.C.R. 89–92. Williams' counsel moved for a change of judge, which motion was granted as to the change of judge, but denied as to the change of venue, and the petition for post-conviction relief was transferred to Judge Richard Conroy of the Lake County Superior Court, Criminal Division, although Magistrate T. Edward Page conducted all hearings in the cause. P.C.R. 231. On November 15, 1984, Chief Justice Shepard directed Judge Conroy to render final judgment on the post-conviction petitions of Williams and five other capital cases by February 28, 1996. P.C.R. 426. Williams filed his amended petition on August 11, 1995, alleging ineffective assistance of trial and appellate counsel, fundamental errors of due process, prosecutorial misconduct, judicial misconduct, a lack of meaningful appellate review, the unconstitutionality of the Indiana death penalty statute on its face and as applied, ineffective assistance due to the failings of the Lake County public defender system, and the cruel and unusual mode of execution by lethal injection. P.C.R. 518–700.

A hearing was held by the court over several weeks beginning on September 18, 1995, and several depositions and exhibits were presented as a part of that hearing. P.C.R. 1535–2801. Attorney David Schneider testified that he had been the attorney responsible for discovery and that he had not seen any discovery which showed that blood was found on Williams' clothing. P.C.R. 1585. Thus, he did not become aware that blood had been found on Williams' clothing until the middle of the trial. P.C.R. 1585.

On February 28, 1996, Magistrate Page, with the approval of Judge Conroy, entered his findings of fact and conclusions of law and dismissed the post-conviction petition in its entirety. P.C.R. 1300–45. He found that the trial court did not commit fundamental error in its jury instructions, its sentencing, its reliance on the pre-sentence investigation, or its consideration of a non-charged robbery in the penalty phase, as alleged in the petition. P.C.R.

1312–17. He found that Williams was not denied effective assistance of counsel due to the public defender system in Lake County, nor due to the errors and omissions of his appellate counsel, nor due to the errors and omissions of his trial counsel. P.C.R. 1317–31. Finally, he found no prosecutorial misconduct or judicial misconduct. P.C.R. 1331–36.

Williams appealed the denial of his petition for post-conviction relief directly to the Indiana Supreme Court, where he raised the following issues: that Williams was denied effective assistance of counsel at trial during both the guilt and penalty phases of the trial, especially in the failure to file a motion for severance, the failure to adequately review the discovery, and the failure to prepare for a penalty phase or for the sentencing hearing; that appellate counsel was ineffective for failing to raise the issue of Williams appearing in jail clothes during voir dire; that the trial judge secretly prepared a psychological profile of Williams without notice to counsel; that the Indiana Supreme Court on direct appeal had failed to give a full and fair review due to various factual errors in its opinion, and that Williams was denied due process by Magistrate Page during the PCR proceedings. *

The Indiana Supreme Court, again writing through Chief Justice Shepard, affirmed the decision of the post-conviction court. *Williams v. State*, 706 N.E.2d 149 (Ind.1999). The court first considered Williams' claims of ineffective assistance of counsel under both state and federal constitutional grounds. *Id.* at 154. The court looked first at Williams' claim that his counsel had failed to adequately review the discovery materials by failing to discover that Epperson had found blood on Williams' shorts prior to trial. *Id.* at 155. While the post-conviction court had found that counsel's failure in this regard was

deficient performance, it found that Williams had not shown prejudice from this failure. *Id.* The Indiana Supreme Court affirmed that decision, finding that Williams' counsel did inform the jury of the blood evidence issues and that expert witnesses on the blood issue would not have provided significantly different evidence on the issue. *Id.* at 156. On the issue of the motion for severance, the court held that no prejudice stemmed from the failure of counsel to renew their motion for severance at the close of the trial, and thus counsel were not ineffective in failing to so renew. *Id.* at 157.

Similarly, the Indiana Supreme Court found that Williams' counsel were not ineffective in their preparation for the penalty phase. *Id.* Williams had argued that his counsel's failure to present his traumatic birth, his hyperactivity, his placement in special education classes, his violent father, his chaotic home, and the poverty of his family and his neighborhood was both deficient and prejudicial. *Id.* The court found that counsel had presented some of the information, and thus their performance was not deficient. *Id.* at 158. Furthermore, the additional information presented in post-conviction proceedings would not have made a difference at trial, and thus no prejudice stemmed from its omission. *Id.* The court also held that Williams' counsel had made an adequate investigation of the crime scene such that they were able to rebut the allegation of the uncharged robbery. *Id.* On the issue of ineffective assistance with respect to the jury instructions, the court held that the instructions given were appropriate and that the suggested instructions would have been denied, and thus counsel was not ineffective on this issue. *Id.* at 159–61. The court declined to find the Lake County Public Defender System presumptively prejudicial. *Id.* at 161. It reviewed the aggravating and mitigating factors and de-

termined that Judge Letsinger's use of a pre-sentence psychological questionnaire would have made no difference in the sentence given. *Id.* at 162. The court found that the factual errors made in its opinion on direct appeal did not make any difference in its decision. *Id.* at 163. Finally, the court held that Williams was not denied due process in the post-conviction proceedings when the trial court excluded certain witnesses Williams sought to present. *Id.* Thus, the court unanimously affirmed the decision of the trial court denying post-conviction relief. The United States Supreme Court denied Williams' petition for certiorari on May 15, 2000. *Williams v. Indiana,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). He filed his petition for habeas corpus relief with this court on May 12, 2000.

## II. Standard of Review

■ A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

> A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume

is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

■ When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams v. Taylor* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context. 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

■ It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke*, 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.*, citing *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary*, 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

### III. Freestanding Claims

### A. Severance

Williams's first claim is that he was denied due process and equal protection when the trial court refused to grant his motion for severance. Williams did not raise this as a free-standing issue in his appeal from post-conviction relief, only as an example of ineffective assistance of counsel. As noted above, the Indiana Supreme Court found that the failure to obtain a severance prior to trial did not prejudice Williams. *Williams v. State*, 706 N.E.2d at 157. In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the United States Supreme Court held that United States District Courts should grant motions for severance when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. The Seventh Circuit explained in *United States v. Clark*, 989 F.2d 1490 (7th Cir.1993) that the defendant must show that he "could not possibly have a fair trial without severance." *Id.* at 1499. That court listed four circumstances which require severance: "1) conflicting and irreconcilable defenses; 2) a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant; 3) a codefendant's statement that incriminates the defendant; and 4) a gross disparity of evidence between the defendants." *Id. Zafiro* explained the first of those circumstances by holding that joinder is prejudicial "when the evidence or testimony offered by one defendant is truly irreconcilable with the innocence of a codefendant." 506 U.S. at 543, 113 S.Ct. 933.

Williams argues that the facts of the trial prove the defenses of Rouster and Williams to be so conflicting and irreconcilable that the failure to sever was highly prejudicial to Williams. He points to the prosecutor's acknowledgment that Rouster's attorney had "argued very effectively ... the blood on Mr. Williams' clothes" and that "Williams was the bad one, the motivator, the person who predominated the situation, according to Mr. Rouster's attorney." T.R. 2644, 3029. Additionally, the trial court's unique procedure of allowing Williams to have rebuttal argument

during closing arguments suggests the antagonistic nature of the defenses. The respondent here argues first that the Indiana Supreme Court held this issue to be waived on direct appeal because Williams did not renew his motion for severance at the close of trial, and that finding of waiver is an independent and adequate state ground barring habeas review. On the merits, the respondent argues that the severance ruling is based on state law and thus does not raise a Constitutional claim for habeas review. Williams responds that he was denied his Constitutional right to individualized consideration in the determination of his penalty, thus raising a Constitutional claim for review.

■ On the merits, this court is not persuaded that the jury was unable to give individualized attention to each defendant's character, history, and the offense in question. While the Supreme Court has mandated individualized consideration of the mitigating and aggravating circumstances in determining the appropriateness of the death sentence, it has never discussed the necessity of severing penalty phases to provide that individualized consideration in joint trials. Thus, this claim is not a "straightforward application of established rules." *Liegakos v. Cooke*, 106 F.3d 1381, 1388 (7th Cir.1997). The Indiana Supreme Court determined that the evidence was such that Williams would have been given the same sentence even if he had been granted a separate trial. 706 N.E.2d at 157. This court finds that even if this issue is not defaulted because it was decided on an independent and adequate state ground by the Indiana Supreme Court, the merits of the issue do not allow for relief because it is neither (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Fed-

eral law, as determined by the Supreme Court of the United States," because the United States Supreme Court has never required severance in capital cases. Thus habeas relief is denied on this issue.

## B. Jail Clothes

Williams next asserts that he is entitled to habeas relief because he was forced to appear before the jury venire in his jail clothes. When Williams appeared for the first morning of trial, he was garbed in blue dungarees which were not marked as jail clothes, but which were readily identified by the court as jail clothes. T.R. 273. Williams' mother had been asked to provide street clothes for her son, but failed to arrive with them prior to trial. T.R. 274. The court offered Williams the choice of staying in the courtroom in his jail clothes or leaving the courtroom until his street clothes arrived, and Williams chose to stay in the courtroom. T.R. 277–78. Williams did not raise this issue on direct appeal. He did raise it as an example of ineffective assistance of appellate counsel in his brief to the Indiana Supreme Court in his post-conviction appeal, but the Indiana Supreme Court denied the claim in a footnote, noting that the due process claim was waived because it was not raised on appeal, and the ineffective assistance claim was denied because no prejudice was shown. 706 N.E.2d at 155, n. 3. Specifically, the court noted that there was "no evidence on the record to show that the clothes had writing on them indicating they were jail clothing. The fact that Williams was seen in such clothing only briefly by possible jurors does not persuade us that Williams was prejudiced by counsel's failure to raise the clothing issue on appeal." *Id.*

The Superintendent responds that the free-standing claim has been procedurally defaulted because it was not raised as a

free-standing claim before the Indiana Supreme Court. He also argues that claim is meritless because Williams was only in the clothes during voir dire and because the clothes were not readily identifiable as prison clothes. Near the end of the trial, Rouster chose to wear his jail clothes to court because his suit had not been cleaned, and the trial judge noted on the record that the clothes were not identified as jail clothing. T.R. 2372. Because Williams wore the clothing only briefly, and because the clothing was not labeled as jail clothing, the Superintendent argues that the claim is meritless and should be denied.

In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the United States Supreme Court held that forcing a defendant to wear identifiable jail clothing during trial is a violation of his Fourteenth Amendment rights to due process and equal protection. In *Estelle,* the defendant asked the jail personnel for street clothes prior to trial. 425 U.S. at 502, 96 S.Ct. 1691. When that request was denied, the defendant appeared in his jail clothes for the length of the trial; however, his attorney never objected to the clothing. *Id.* The Supreme Court held that compelling the defendant to wear jail garb would be a "continuing influence throughout the trial" which would wear away at the defendant's presumption of innocence. *Id.* at 505, 96 S.Ct. 1691. However, the Court affirmed the conviction because "failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Id.* at 512–13, 96 S.Ct. 1691.

■ The Indiana Supreme Court addressed this issue under the *Estelle* standard, as adopted by the Indiana Supreme Court in *Shackelford v. State,* 498 N.E.2d

382 (Ind.1986), and determined that no Constitutional violation had occurred because the clothing was not readily identifiable as jail clothing. 706 N.E.2d at 155, n .3. Thus, the question for this court is whether that determination is "an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This court finds that determination is not an unreasonable application of *Estelle.* From what little discussion of the clothing is available in the record, it appears that the clothing is not labeled as jail clothing, although the trial judge recognized it to be such, where in *Estelle,* the clothing was clearly labeled with the words "Harris County Jail." 425 U.S. at 515, n. 1, 96 S.Ct. 1691. Also, the clothing was only worn on the first day of trial, during voir dire, and not during the rest of the trial. Thus, it was not the "continuing influence" on the presumption of Williams' innocence that the Supreme Court was concerned about in *Estelle.* Thus, as the court finds the Indiana Supreme Court's determination to be a reasonable application of United States Supreme Court law, petitioner's request for habeas relief on this issue is denied.

### C. Uncharged Robbery

■ Williams' third claim is that his rights of due process and equal protection were violated when the trial court admitted evidence of an uncharged robbery allegedly committed by Williams during the penalty phase of the trial. During the state's case-in-chief in the penalty phase, the state presented the testimony of James Jackson, who testified that he was robbed by three men who beat him, tied him up, stole $600.00 and a gun from him, and ransacked his bedroom. T.R. 2827–33. A neighbor of Jackson's then identified Williams as one of the three assailants.

T.R. 2894. During its closing argument in the penalty phase, the state argued that the robbery rebutted the mitigating factor of lack of significant criminal history, although it also mentioned parallels between the robbery and the Reases' murders. T.R. 3116, 3118–19.

The Indiana Supreme Court on direct appeal determined that the evidence was properly admitted to negate the mitigating circumstance of "no significant history of prior criminal conduct." 600 N.E.2d at 1348. Because mitigating factors need only be proven by a preponderance of the evidence, and because the weighing of aggravating and mitigating circumstances is also determined by a preponderance, the court found that due process concerns regarding independent crimes are not as great when they are offered to rebut a mitigating circumstance. *Id.* at 1349.

This court finds the decision of the Indiana Supreme Court to be a reasonable determination of the due process concerns argued by Petitioner. Additionally, Petitioner has not shown any Supreme Court precedent directly relevant to this issue, and thus has not shown how the Indiana Supreme Court's decision is either contrary to, or an unreasonable application of, Supreme Court precedent. Therefore, this court must deny habeas relief on this claim.

### D. Sufficiency

Williams next argues that the evidence presented was insufficient to support the death penalty, thus violating his rights to due process, equal protection, and other rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments. In his petition, Williams argues that the evidence was insufficient to show that Williams intentionally killed the victims. In his brief, Williams argues that the evidence was insufficient to prove the robbery for the felony murder. In his traverse,

Williams argues that new evidence presented to this court regarding Derrick Bryant's mental health and the lack of blood found on Williams' shorts casts doubt on the sufficiency of the evidence. The Superintendent responds that the Indiana Supreme Court correctly determined that the evidence supported the death sentence.

 Under *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The Indiana Supreme Court found that Williams and Rouster re-entered the house after being asked to leave, after Williams was heard telling Rouster "she's gyping you out of your money." 600 N.E.2d at 1342. Derrick Bryant heard Williams tell Henrietta to get on the floor and heard Williams say "it's your time" immediately prior to shots being fired *Id.* at 1345–46. Williams was caught after leading police on a foot chase across a major interstate highway and was found to have $234.71 in cash in his pouch at the time of his arrest. *Id.* at 1345. Additionally, blood was found on Petitioner's shorts which was consistent with the Reases. T.R.1966–67. This record, taken in the light most favorable to the State, as required by *Jackson,* supports the finding that Petitioner intentionally killed the Reases while committing robbery. Williams has suggested several instances in which the evidence viewed in the light most favorable to him would not support the verdict or sentence, but that is not the appropriate test under *Jackson.* The Indiana Supreme Court applied the appropriate test, and this court does not find that determination to be contrary to or an unreasonable application of clearly estab-

lished Supreme Court precedent. This court declines petitioner's invitation to re-weigh the evidence and denies habeas relief on this issue.

### E. Psychological Questionnaire

■ Williams claims that his rights to due process and equal protection were violated when the trial court judge had a psychological profile secretly compiled on petitioner and relied on that profile in determining petitioner's sentence, rendering the sentence unreliable. Prior to sentencing, Judge Letsinger had the probation department prepare a psychological profile of Williams. Although Judge Letsinger later stated that the questionnaires were routinely attached to the pre-sentence investigation report, Williams' counsel did not recall having seen the questionnaire at the time of sentencing. 706 N.E.2d at 162. After the post-conviction proceedings had been concluded and while Williams' denial of post-conviction relief was on appeal, counsel discovered the questionnaire and petitioned the Indiana Supreme Court to consider the effects of the questionnaire on Williams' sentence. The Indiana Supreme Court had previously addressed the issue of Judge Letsinger's questionnaires in *Matheney v. State*, 688 N.E.2d 883 (Ind.1997) and had determined that an independent review of the aggravating and mitigating circumstances to determine if the sentence was appropriate would be the appropriate course. The court conducted the same review in Williams' case and determined that the aggravating factors outweighed the mitigating circumstances, without reference to the psychological questionnaire, and thus upheld the sentence. 702 N.E.2d at 163.

■ This court has also reviewed Judge Letsinger's psychological questionnaire in *Matheney v. Anderson*, 60 F.Supp.2d 846, 865 (N.D.Ind.1999), *aff'd*

*in part, rem'd in part*, 253 F.3d 1025 (7th Cir.2001), and found it to pass constitutional muster. Under *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), a defendant has the right to hear all information used in the capital decision making process. Specifically *Gardner* banned the use of an undisclosed pre-sentence questionnaire by the sentencing judge in imposing a death sentence. *Id.* at 363, 97 S.Ct. 1197. In both *Matheney* and this case, the Indiana Supreme Court found that Judge Letsinger did not actually rely on the questionnaire in imposing the death sentence. 706 N.E.2d at 162, n. 9. Furthermore, the Indiana Supreme Court independently weighed the aggravating and mitigating circumstances and determined that the sentence was supported by the evidence without reference to the questionnaire. *Id.* at 162. As in *Matheney v. Anderson*, this court finds no Constitutional error in process, given the Indiana Supreme Court's independent review of the sentence. Thus, this court will deny habeas relief on this issue.

### IV. Ineffective Assistance of Counsel Claims

### A. Standard of Review

■ Several of Williams's claim before this court assert ineffective assistance of counsel at trial. That claim is considered under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on this claim, Williams must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judg-

ment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

 There is no question after *Williams v. Taylor* that *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams,* 120 S.Ct. at 1512. Additionally, it is clear that the Indiana Supreme Court has not decided this issue in a manner "contrary to . . . clearly established Federal law." The Indiana Supreme Court followed the dictates of *Strickland,* quoting as follows:

> A deficient performance is a performance that falls below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Douglas v. State,* 663 N.E.2d 1153 (Ind.1996). Prejudice exists when a defendant/petitioner shows "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

*Williams v. State,* 706 N.E.2d at 154. As the Indiana Supreme Court clearly bases its analysis of ineffective assistance of counsel claims under the two-part test of *Strickland,* this court cannot find that the Indiana Supreme Court's analysis is contrary to clearly established Federal law. Thus the question for this court is whether the Indiana Supreme Court's decision af-

firming the denial of Williams's petition for post-conviction relief "involved an unreasonable application of" *Strickland.*

 A highly relevant paradigm for the federal judicial task here has been very recently provided by the Court of Appeals in *Whitehead v. Cowan,* 263 F.3d 708 (7th Cir.2001), which provides for the necessary mix of state and federal judicial functions, giving due respect for the state court function under the AEDPA. Under that standard, the state decisions here are well within the constitutional decisions of the Supreme Court of the United States. This standard was clearly explicated in *Whitehead:*

> As the Supreme Court has explained, a state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is an "unreasonable application" of clearly established Supreme Court precedent when "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.
>
> On appeal from a ruling on a petition for habeas relief, we review the district

court's findings of fact for clear error and its rulings on issues of law de novo. See *Denny v. Gudmanson*, 252 F.3d 896, 900 (7th Cir.2001). If the case falls under the "contrary to" clause of § 2254(d)(1), then we review the state court decision de novo to decide what is clearly established law as determined by the Supreme Court and whether the state court decision was "contrary to" that Supreme Court precedent. *See id.* If, on the other hand, the case falls under the "unreasonable application" clause, then we defer to a reasonable state court decision. *See id.* Moreover, state court factual findings that are reasonably based on the record are presumed correct. See 28 U.S.C. § 2254(e)(1); *Gudmanson*, 252 F.3d at 900.

263 F.3d at 716–17. Applying the standard to a claim of ineffective assistance of counsel, the *Whitehead* court added:

The Supreme Court set forth the requirements for an ineffective assistance of counsel claim in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* the petitioner must demonstrate 1) that his counsel's performance was deficient, such that under the circumstances it was unreasonable under prevailing professional norms, and 2) that he was prejudiced by his counsel's deficient performance. As we noted in *Holman v. Gilmore*, "*Strickland* calls for inquiry into degrees; it is a balancing rather than a bright-line approach.... This means that only a clear error in applying *Strickland* 's standard would support a writ of habeas corpus." 126 F.3d 876, 881 (7th Cir.1997). This is because "*Strickland* builds in an element of deference to counsel's choices in conducting the litigation [and] § 2254(d)(1) adds a layer of respect for a state court's application of the legal standard." *Id.*

*Id.* at 731. The careful review by Chief Justice Shepard for a unanimous state supreme court in *Williams*, 706 N.E.2d at 154 (Ind.1999) is exactly what *Whitehead, Strickland,* and *Williams v. Taylor* require. More recent judicial teachings on ineffective assistance of counsel in noncapital cases support the reasoning and result of Chief Justice Shepard. *See Valenzuela v. United States*, 261 F.3d 694 (7th Cir.2001); *United States ex rel. Bell v. Pierson*, 267 F.3d 544 (7th Cir.2001), and *Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001).

## B. Failure to Review Discovery

Williams first argues that his trial counsel was ineffective for failing to adequately review the discovery. Williams asserts that his counsel failed to find the following items in the discovery provided to them: 1) the presence of blood on the petitioner's shorts, consistent with that of the victims; 2) inconsistencies in police reports regarding the location of the victims; 3) pictures of the crime scene which showed the haphazard nature of the investigation; and 4) the statement of Elliott Streeter, which comported with the defense theory that Williams was outside of the house during the shootings. With respect to the blood on the shorts, Williams argues that the failure of his counsel to read serologist Epperson's report and to note that she had found blood on Williams' shorts was especially critical, as his counsel's strategy was to argue that Williams was not in the room during the shootings, which was refuted by the blood evidence. During post-conviction proceedings, Williams' trial counsel both testified that they did not learn of the blood evidence until the middle of the trial. P.C.R. 1579, 1971. Additionally, the police evidence technicians and detectives involved in Williams' arrest all testified that they looked very closely for blood on

Williams, and finding none, allowed him to remain in his clothing while at the Gary Jail. P.C.R. 2281–82, 2712, 4668–69. Williams' counsel also failed to note inconsistencies in the police reports regarding the location of the victims. Officer Buse Smith reported that he first observed Henrietta "lying face down on bed," which was inconsistent with Officer Rita Dorsey's testimony that the mattress was tipped over and Mrs. Rease was found lodged between the mattress and the floor. Similarly, the pictures at the crime scene supported Rita Dorsey's testimony, but were rebutted by the testimony of Officer Michael Gault at post-conviction, who also testified that Mrs. Rease was lying over the bed when he saw the scene. The pictures also showed that a bloody footprint left by one of the perpetrators was obliterated by the officers moving the bodies. The pictures also showed blood spatter evidence which was destroyed by the officers at the scene. Finally, Elliott Streeter, a neighborhood resident, gave a recorded statement to the prosecutors on August 14, 1986, stating that he saw Williams leaving the Rease home by the side door as he heard the shots being fired. Williams' counsel admitted that they had the tape in their possession, but never listened to the tape nor requested a transcription.

Williams presented the blood evidence and crime scene evidence issues to the Indiana Supreme Court, but did not present the Elliott Streeter testimony. The Indiana Supreme Court only addressed the blood evidence in its opinion on post-conviction relief. The post-conviction court had determined that the failure of Williams' counsel to read the discovery materials regarding the blood found on Williams' shorts was an example of deficient performance, but that his counsel had made some efforts to address the blood issues in their closing arguments and that no prejudice had resulted from their defi-

cient performance. 706 N.E.2d at 155–56. The Indiana Supreme Court affirmed that decision, holding as follows:

> "Even if Williams' counsel had more thoroughly investigated the blood evidence, as his counsel was able to do for post-conviction, they would have been unable to provide the jury with any information significantly different from that actually provided by the State's witness. Because the evidence Williams argues should have been presented would not have significantly changed the facts available to the judge and jurors, Williams was not prejudiced during either the guilt or sentencing phase of his trial."

*Id.* at 156.

■■■■■ The Respondent argues first that claims regarding the crime scene, the photographs, and the testimony of Elliott Streeter have been procedurally defaulted for failure to present them to the Indiana Supreme Court. As it is clear that the Elliott Streeter issue was not presented to the Indiana Supreme Court, this court will now find that issue procedurally defaulted under *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) and *Farrell v. Lane,* 939 F.2d 409 (7th Cir.1991). With respect to the blood evidence, Respondent argues that the Indiana Supreme Court correctly determined that counsel had raised the blood evidence issue with the jury and that experts would not have provided significantly different evidence had they been called.

Williams responds that the jury was never informed that the police did not find blood on Williams' clothing when he was arrested, nor were they told of the possibility of contamination of Williams' clothing while at the Gary City Jail, nor that the testing of Williams' clothing was against crime lab policy due to the condi-

tion in which it was stored. Thus he argues that the Indiana Supreme Court's finding that "counsel did inform the jury of the blood evidence issues presented here" is an unreasonable determination of the facts and thus not entitled to deference. Additionally, Williams argues that his counsel's deficient performance clearly prejudiced him because the blood on the shorts was the sole piece of physical evidence tying Williams to the murder room.

As an initial matter, while there was certainly a great deal more evidence presented on the blood evidence issue at post-conviction, this court is not willing to find the Indiana Supreme Court's finding an unreasonable determination of the facts under 28 U.S.C. § 2254(e)(1). While Williams' trial counsel testified at post-conviction that they ignored the blood evidence, the fact is that they did raise the blood issue in their closing arguments and attempted to cast doubt on it at that time. Certainly, had they performed in an appropriate manner, they would have done better, but they did try at the time. The Indiana Supreme Court found that the closing arguments, coupled with Epperson's testimony, "rendered Williams' trial a reliable adversarial testing process. *See Strickland*, 466 U.S. at 686, 104 S.Ct. 2052." 706 N.E.2d at 156. Giving that factual determination deference under 28 U.S.C. § 2255(e)(1), this court does not find the opinion of the Indiana Supreme Court to be an unreasonable application of the *Strickland* standard. Counsel did make efforts to combat the blood evidence once they were aware of it, and this court does not believe that the further evidence regarding the blood evidence presented at post-conviction would have been sufficient to give Petitioner "a significant, not merely a theoretical, chance of acquittal" as was found in *Miller v. Anderson*, 255 F.3d 455 (7th Cir.2001), *reh'g vacated*, 268 F.3d 485 (7th Cir.2001). Thus, the court will deny relief on this ground.

### C. Failure to Renew Severance Motion

Williams next argues that his counsel provided ineffective assistance when they failed to renew and sufficiently advocate the motion for severance. Petitioner argues that his attorneys failed to recognize that he and Rouster would have mutually antagonistic defenses requiring severance, and further argues that their failure prejudiced him by denying him the individualized consideration to which he was entitled under the Eighth and Fourteenth Amendments.

The Indiana Supreme Court determined that Williams and Rouster's defenses were not so mutually antagonistic that the "acceptance of one party's defense precludes the acquittal of the other." 706 N.E.2d at 157. Because both were convicted of felony murder, the claims by each that the other had pulled the trigger were irrelevant, because under Indiana law, all participants in a robbery which results in a killing are deemed equally guilty of murder. *Id.* Additionally, the court held that the evidence presented against Williams during the penalty phase was sufficient to support the jury's recommendation, and would have supported the same sentence even if Williams had been tried separately. *Id.* Thus, the Indiana Supreme Court did not find deficient performance or prejudice on this claim. *Id.*

▮▮▮ This court has already considered and denied Williams' freestanding claim of error for failing to sever his trial from his co-defendants, and it will now deny his claim of ineffective assistance of counsel for the failure to sever. Under *Hernandez v. Cowan*, 200 F.3d 995, 999 (7th Cir.2000), this court could only find prejudice "if there was a reasonable probability that severance would have made a difference to

the outcome of the trial." As with his co-defendant Rouster[3], this court does not believe that severance would have made a difference, and thus, the court will deny habeas relief on this claim.

### D. Crime Scene Evidence

■ Williams next asserts error in his counsel's failure to investigate the crime scene. During his post-conviction proceedings, Williams presented evidence to show that two of the responding officers found Mrs. Rease lying face down on the bed or some other object, whereas the testimony presented at trial by the State was that the victims were both lying on the floor and the mattress had been "thrown around." T.R. 1278, P.C.R. 4417. Williams argues that had his counsel been aware of the varying testimony, they could have used that to combat the inference that Williams had participated in the uncharged robbery which was used to rebut his mitigating circumstance of "no significant history of prior criminal conduct." Williams also asserts in his petition that his counsel should have hired a serologist and a blood spatter expert, both of which experts could have rebutted the blood evidence and shown Williams not to be a triggerman. Williams further asserts that his counsel should have also engaged ballistics or gun shot residue experts and a psychologist or toxicologist, but as these experts were not raised in the state court proceedings, this court finds them to be procedurally defaulted. *Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728.

The Indiana Supreme Court initially determined that the trial court had given Williams the mitigating circumstance of "no significant history of prior criminal conduct," and thus had not given credit to the State's argument regarding Williams' uncharged robbery. 706 N.E.2d at 158.

Therefore, no prejudice stemmed from the failure to rebut the uncharged robbery incident. Additionally, the court held that the additional evidence regarding the position of the bodies was not significantly different from that presented at trial, and thus did not lead to a conclusion opposite that of the post-conviction court. *Id.* at 159. The court also determined that Williams had not shown how his counsel's failure to hire a blood spatter expert prejudiced his trial or sentence, and thus they did not find ineffective assistance of counsel on this issue.

This court does not find the Indiana Supreme Court's determination to be an unreasonable application of the *Strickland* standard. Other testimony linked Williams to the uncharged robbery other than the upturned mattress, and thus his counsel's failure to investigate the crime scene evidence did not prejudice him. On the blood spatter expert issue, Williams has not shown how the lack of an expert has caused his trial to be unreliable. Thus, he has failed to show prejudice on that issue. Because no prejudice has resulted from these issues, no relief is appropriate, and habeas will be denied on this claim.

### E. Jury Instructions

Williams claims that his counsel provided ineffective assistance when they failed to request certain jury instructions, specifically, an intoxication instruction, an instruction on sentencing alternatives, an instruction that mitigating circumstances did not require unanimity or proof beyond a reasonable doubt, an instruction that the jury could consider anything as a mitigating circumstance, an instruction of the definition of "intentionally" and an instruction that they were to weigh each co-defendant's mitigating and aggravating circum-

---

**3.** *See Rastafari v. Anderson,* 117 F.Supp.2d 788, 804 (N.D.Ind.2000).

stances separately. Williams argues that the jury should have been instructed that intoxication could prevent the State from proving intent for either the trial or penalty phase. He asserts that the jury instruction on sentencing alternatives did not make clear that Williams could be sentenced to consecutive sentences for each murder. He claims that the court should have expanded on the statutory mitigating circumstances to explain that other factors could be considered in determining the weight of mitigation. Williams alleges that his counsel was ineffective for failing to seek a jury instruction that mitigating circumstances did not require unanimity or proof beyond a reasonable doubt. Finally, he charges that the failure to instruct the jury to weigh each defendant's aggravating and mitigating circumstances separately denied him the right to the individualized sentencing required under *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

█ Respondent first asserts that only three instruction errors were raised with the Indiana Supreme Court, that the instructions did not inform the jury they were to weigh each defendant separately, that the sentencing alternatives available included consecutive sentencing, and that the jury should have been instructed on the intoxication issue during the penalty phase. As the other issues were not raised before the Indiana Supreme Court, this court now finds them to be procedurally defaulted. *See Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728.

█ With respect to the individualized weighing instruction, the Indiana Supreme Court held that the court appropriately instructed the jury as follows:

The jury may recommend the death penalty be imposed against defendant, Darnell Williams, only if it finds:

1. that the State has proved beyond a reasonable doubt the existence of one of the aggravating circumstances alleged in the charging information against Darnell Williams, and

2. that any mitigating circumstances that exist for Darnell Williams are outweighed by one or more of the aggravating circumstances for Darnell Williams.

706 N.E.2d at 160. The Indiana Supreme Court held that this instruction made it clear that the aggravating and mitigating factors had to exist for Darnell Williams before they could make a recommendation of death. *Id.* This court finds that determination to be a reasonable application of the *Strickland* standard and will not grant relief on this issue.

█ The second challenged instruction dealt with sentencing alternatives:

In the State of Indiana, if the death penalty is not imposed, the sentence for murder is a fixed sentence of from thirty (30) to sixty (60) years. The presumptive penalty is forty (40) years. The Court at sentencing imposes a specific number of years within that range.

In the State of Indiana, a defendant can earn credit for good behavior to apply against the sentence, with a maximum allowable credit of fifty percent (50%) of the sentence imposed by the Court.

706 N.E.2d at 160. Williams argues that this instruction failed to provide the jury with any information regarding the potential for consecutive or concurrent sentencing in violation of *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). *Simmons* held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156, 114 S.Ct. 2187. The

Indiana Supreme Court held that the even if *Simmons* did apply to this circumstance, it was decided more than a year after the Indiana Supreme Court had ruled on Williams' direct appeal. 706 N.E.2d at 160. Thus the court did not find Williams' counsel's performance deficient for failing to state a claim under *Simmons,* since such was not available at the time. *Id.* This court finds the decision of the Indiana Supreme Court to be a reasonable application of *Strickland* and thus will not grant relief on this issue.

■ Finally, Williams argues that his counsel should have offered a penalty phase instruction informing the jury that intoxication could negate the intent requirements of two of the aggravating factors. The Indiana Supreme Court ruled that while an intoxication defense is still available in the penalty phase because the State is required to prove the aggravating factors beyond a reasonable doubt, an intoxication instruction would have been denied in the penalty phase because it was given during the trial phase in conjunction with an instruction requiring "knowingly or intentionally attempting to take property," and the jury convicted Williams of felony murder. *Id.* at 161. The court continued, "[t]his verdict was consistent with the considerable evidence that Williams could communicate, deliberate, and act toward a chosen end during his encounter with the Reases. We conclude that the trial court would have refused an intoxication instruction and that counsel was thus not deficient for failing to tender one." *Id.* The court's conclusion that counsel was not ineffective for failing to offer an intoxication instruction in the penalty phase is not an unreasonable application of *Strickland,* and thus this court will not grant habeas relief on this claim.

### F. Preparation for Penalty Phase

■ Williams argues that his counsel failed to prepare and present mitigating evidence regarding his lack of criminal history, traumatic birth, his hyperactivity, his placement in special education classes, his violent father, his chaotic home, the poverty of his family, and that he once saved another person's life. Williams' counsel did not contact potential witnesses for the penalty phase until the day they learned about the blood found on Williams' shorts. P.C.R. 2826. Nor did either of Williams' counsel develop a relationship with Williams. P.C.R. 1562, 1957–58. Counsel asked Williams' mother to obtain his school records, but did not follow up when she failed to deliver them. Counsel failed to interview the witnesses they did call, and thus did not elicit all of the available information from them.

The post-conviction court ruled that the mitigation evidence presented at post-conviction would not have been found to outweigh the aggravating circumstances and concluded that trial counsel's performance was neither deficient nor prejudicial. P.C.R. 1326. The Indiana Supreme Court affirmed that decision, holding that the evidence of Williams' mental state, and specifically his IQ, were entitled to only moderate weight, and thus would not have "garnered a different result for Williams at trial." 706 N.E.2d at 158. The Indiana Supreme Court also held that his counsel had an adequate sentencing strategy beyond the "free form" sentencing which was found ineffective in *Averhart v. State,* 614 N.E.2d 924 (Ind.1993). *Id.* His counsel elicited several pertinent facts from Williams' mother regarding various mitigating factors, including his age, his employment, and his character. *Id.* Thus, the court found that Williams' counsel's performance in the penalty phase was not ineffective. *Id.*

This court does not find the opinion of the Indiana Supreme Court to be an un-

reasonable application of the *Strickland* standard. Certainly Williams' counsel could have presented more or been more prepared, but they did present the broad outlines of Williams' history and character. Thus, this court will deny habeas relief on this claim.

### G. Appellate Counsel Error

■ Williams argues that his appellate counsel provided ineffective assistance of counsel when they failed to raise the jail clothes issue in his direct appeal. The Indiana Supreme Court determined that Williams did not show any prejudice on this claim because the clothes were not readily identifiable. 706 N.E.2d at 155, n. 3. Similarly, this court has determined that no Constitutional error occurred when Williams sat before the venire in his unidentified jail clothing. *See Section III.B. supra.* Because the underlying issue has no merit, Williams' claim that his counsel were ineffective for failing to raise it on appeal must fail because no prejudice stems from the failure to raise a meritless issue. *See Dennis v. Poppel,* 222 F.3d 1245 (10th Cir.2000). Thus, this court will not grant relief under 28 U.S.C. § 2254 on this claim.

## V. Other Issues

### A. Post–Conviction Court Errors

Williams asserts that he was denied due process and equal protection when the post-conviction court excluded testimony from a forensic social worker and a registered nurse. Jill Miller, a forensic social worker, prepared a detailed social history on Williams which was relied upon by several of the other experts, but the post-conviction court refused to admit the report or Miller's deposition, ruling that "[t]he summary of someone who investigated these things and put together an appraisal of what they thought the merit of this mitigating factors would be is inappro-

priate and will not be admitted." P.C.R. 2225. Jean Thompson, a registered nurse, reviewed Williams' birth records and prepared a report which deciphered the medical technology and explained Williams' birth complications. P.C.R. 4403–06. Again, the post-conviction court sustained an objection to the report, and it was returned to Williams' counsel. P.C.R. 2239–41. The Indiana Supreme Court affirmed the trial court's decision to exclude the two reports, holding that the trial court did not abuse its discretion in determining that the social worker's report was cumulative and that Williams had not proven that he suffered from any of the potential conditions which might have been caused by the birth complications outlined in the nurse's report. 706 N.E.2d at 163–64.

Williams argues that the post-conviction court's decision denied him due process by precluding the court from considering additional mitigating evidence, as mandated by *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Supreme Court held that excluding mitigating evidence as cumulative may be implausible under the facts of a case if the court cannot conclude that the excluded evidence would have had no impact on the jury's deliberations. 476 U.S. at 8, 106 S.Ct. 1669. Thus, Williams argues that the Indiana Supreme Court's determination that the evidence was cumulative impeded the court's ability to consider all relevant facets of his character in determining his sentence, and thus violated *Skipper.*

■ This court first notes that the evidence was excluded during post-conviction

proceedings, and not during the actual trial. Thus, it is unclear whether the protection of *Hitchcock, Eddings, Lockett,* and *Skipper* apply at all. Additionally, Williams did not raise this claim as a Constitutional issue in his appeal to the Indiana Supreme Court. Finally, Williams has failed to show how the Indiana Supreme Court decision was contrary to or an unreasonable application of clearly established Federal law, as required by 28 U.S.C. § 2254(d)(1). Thus, this court will not grant relief on this claim.

## B. Ex Parte Conversation with Jury

Williams alleges that he was denied due process and equal protection when the trial judge had an ex parte conversation with the jury after they returned their recommendation of death and before he imposed the death penalty. At the sentencing hearing, Judge Letsinger stated on the record as follows:

> I probably ought to put that on the record. They did ask to talk to me. I do go into the Jury room. Three of them were sobbing rather openly, crying rather openly and I think Mr. Augustine, said, we just wanted you to know how difficult this was and that was the extent of the conversation I had with the jury.

T.R. 3308. Williams argues that the meeting between the judge and the jury renders his sentence unconstitutional because it was based in part on information that he had no opportunity to rebut or deny, in violation of *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

■ Williams, however, failed to present this claim to the Indiana Supreme Court on either direct appeal or in post-conviction proceedings. Therefore, he has procedurally defaulted this claim. *See Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728. Even if he had raised this claim previously,

it is meritless. In *United States v. Gagnon,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the Supreme Court held that a defendant "has no constitutional right to be present at every interaction between a judge and a juror." 470 U.S. at 526, 105 S.Ct. 1482. However, he does have "a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Id.* (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). Williams has not shown what difference his presence might have made, nor how he might have been prejudiced by the jury's comment that its decision was "very difficult." Therefore, this court will not grant relief under 28 U.S.C. § 2254 on this claim.

## C. Impartial Tribunal

■ Williams argues that he was denied his right to due process and equal protection because the trial judge was not impartial. Specifically, Williams argues that the trial judge's rulings in "forcing" him to wear his jail clothes during the voir dire, allowing the presentation of the uncharged prior robbery during its case-in-chief, allowing the state to surprise the defense with the evidence of the uncharged prior robbery, the use of the psychological questionnaire, the court's ex parte meeting with the jury, and the judge's handwritten notes, which suggest that he made determinations about Williams' character outside the evidence, all combined to render the trial judge biased against Williams. However, Williams did not raise the issue of an partial judge with the Indiana Supreme Court either during his direct appeal or during his post-conviction appeal. Thus, he has procedurally defaulted this claim. *See Boerckel,*

526 U.S. at 844, 119 S.Ct. 1728. Therefore, no relief can be granted on this issue.

## D. Lake County Public Defender's System

■ Williams asserts that he was denied due process and equal protection due to the system-wide deficiencies inherent in the Lake County Public Defender's Office. The Indiana State Public Defender hired the Spangenberg Group to study the public defender system in Lake County. The Spangenberg Group issued a report on December 31, 1994 which asserted that the Lake County Public Defender's Office was inherently defective because the office was understaffed and underfunded and because the defenders were selected by the judges in whose courtrooms they served, creating an inevitable conflict of interest. Williams specifically asserts that the deficiencies in the Lake County system prejudiced him because his counsel failed to investigate mitigation evidence or obtain experts which would have cost money the Lake County Public Defender's Office did not have and was unwilling to request.

The Indiana Supreme Court addressed this contention in its opinion on post-conviction relief and rejected, as they had rejected similar challenges based on the Spangenberg report. *See Coleman v. State*, 703 N.E.2d 1022 (Ind.1998); *Brown v. State*, 698 N.E.2d 1132 (Ind.1998); *Roche v. State*, 690 N.E.2d 1115 (Ind.1997). The court found that Williams, like the others, was attempting to make a claim under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), a companion case to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Cronic*, the Supreme Court held that there are occasionally surrounding circumstances which make it so unlikely that a defendant will receive effective assistance of counsel that

the court may infer ineffective assistance of counsel without reference to specific errors made by counsel. 466 U.S. at 660, 104 S.Ct. 2039. The Indiana Supreme Court determined that in this case, Williams had only made "vague comments about overwhelming caseloads and inadequate training of an assisting attorney for capital cases," and that that evidence "simply does not come close to triggering *Cronic*'s presumption of prejudice." 706 N.E.2d at 161.

Williams also asserts that he is entitled to a hearing to determine if an actual conflict of interest existed between Williams and the public defenders, who served at the pleasure of Judge Letsinger, and cites the Seventh Circuit's opinion in *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1305 (7th Cir.1996), *rev'd on other grounds*, 522 U.S. 802, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997) for the proposition that a showing of actual conflict mandates habeas relief. While a showing of actual conflict would require relief, Williams has not presented anything here which begins to show an actual conflict, nor has he included this issue in his request for an evidentiary hearing. Additionally, Williams failed to raise the issue of conflict of interest with the Indiana Supreme Court, and thus, the issue has been procedurally defaulted. *See Boerckel*, 526 U.S. at 844, 119 S.Ct. 1728. To the extent the Spangenberg report was raised before the Indiana Supreme Court, that court's determination of the issue was neither contrary to nor an unreasonable application of the appropriate United States Supreme Court precedent. Thus, habeas relief is inappropriate on this claim.

## E. "Death Row Phenomenon"

■ Williams claims that his rights to due process and equal protection have been denied by the length of his incarceration on death row. Williams has been

incarcerated in the Indiana State Prison in the death row section since March, 1987, some fourteen years. He argues that spending this length of time awaiting his execution has caused him cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. He admits that no Supreme Court precedent exists on this claim, but points to Justice Stevens' opinion on denial of certiorari in *Lackey v. Texas,* 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995), which suggests that this is a potential claim which should be considered by the lower courts before determination by the Supreme Court. *Id.* at 1047, 115 S.Ct. 1421.

Initially, as the respondent notes, Williams failed to raise this issue before the Indiana Supreme Court and therefore has procedurally defaulted the claim. *See Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728. Additionally, as there is no Supreme Court precedent on this issue, Petitioner cannot show that the state court's adjudication is contrary to or an unreasonable application of that precedent. Finally, the courts which have considered this issue have all rejected it. *See Ex Parte Bush,* 695 So.2d 138, 140 (Ala.1997); *Hill v. State,* 331 Ark. 312, 962 S.W.2d 762, 767 (1998); *State v. Schackart,* 190 Ariz. 238, 947 P.2d 315, 336 (1997); *People v. Frye,* 18 Cal.4th 894, 77 Cal.Rptr.2d 25, 959 P.2d 183, 262 (1998); *People v. Massie,* 19 Cal.4th 550, 79 Cal. Rptr.2d 816, 967 P.2d 29, 44–45 (1998); *Booker v. State,* 773 So.2d 1079, 2000 WL 1472497, *16 (Fla. Oct.5, 2000); *McKinney v. State,* 133 Idaho 695, 992 P.2d 144, 151 (1999); *Bell v. State,* 938 S.W.2d 35, 53 (Tex.Crim.App.1996); *State v. Smith,* 280 Mont. 158, 931 P.2d 1272, 1287–88 (1996); *White v. Johnson,* 79 F.3d 432, 439–440 (5th Cir.1996); *Stafford v. Ward,* 59 F.3d 1025, 1028 (10th Cir.1995). This court does not find this claim to be cognizable and thus no relief is merited.

**F. Prosecutorial Misconduct**

Williams alleges that he was denied due process and equal protection by a pattern of prosecutorial misconduct, including the prosecutor's failure to disclose the criminal history of Edwin Taylor or the psychiatric history of Derrick Bryant. Additionally, Williams asserts that the prosecutor used perjured testimony, presented misleading testimony, failed to inform Williams of their intent to use the uncharged prior conduct to rebut the lack of criminal conduct mitigator, failed to provide a transcript of a statement taken by the prosecutors, and mischaracterized the blood evidence found on Rouster. However, Williams again failed to raise any of this issue before the Indiana Supreme Court, having abandoned some claims made in post-conviction and having failed to make some of the claims despite being in possession of the necessary material to raise the claim. Because the claims were not raised before the state court, Williams has procedurally defaulted them. *See Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728.

Nor would Williams succeed on the merits of this claim. With respect to the Taylor and Bryant information, Williams would not have been able to use the information to impeach either witness, as Indiana state law did not permit the use of juvenile records for impeachment, nor did it allow the use of mental health records for impeachment where there was no evidence the witness had a mental disability at the time of the murder or of giving testimony. *See Engle v. State,* 506 N.E.2d 3 (Ind.1987); *Witte v. State,* 516 N.E.2d 2 (Ind.1987). With respect to the other claims, the post-conviction court did not find any evidence to support those claims. P.C.R. 1332–34. As this finding is neither contrary to nor an unreasonable application of Supreme Court precedent, no relief is warranted.

### G. Cumulative Effect

Finally, Williams asserts that the cumulative effect of the violations asserted above compel relief under 28 U.S.C. § 2254. As Williams failed to make this claim before the Indiana Supreme Court, he has procedurally defaulted this claim. *See Boerckel,* 526 U.S. at 844, 119 S.Ct. 1728. Additionally, this court has not found any error in the preceding sections. As explained by the Seventh Circuit in *Alvarez v. Boyd,* 225 F.3d 820 (7th Cir. 2000), where there is "no error, or just a single error, there are no ill effects to accumulate and so a petitioner in such a case could not prevail on this theory." 225 F.3d at 825. Thus, this claim must fail.

### VI. Conclusion

Despite an exhaustive review of the evidence and the claims presented by this petitioner, this court cannot find a violation of 28 U.S.C. § 2254. Thus, the petition for writ of habeas corpus is now **DENIED.**

**IT IS SO ORDERED.**