IN THE INDIANA SUPREME COURT

WILLIAMS, Darnell,
 Petitioner,

 v.

STATE OF INDIANA,
 Respondent.
)
)
)
)
)
)
)
Supreme Court case no.
45S00-0306-SD-248

Lake Superior Court case no.
2CR-133-886-531

 ORDER DENYING REHEARING IN CAPITAL CASE
 AND RULING ON MISCELLANEOUS MATTERS

 Introduction.

 Since being convicted of murder and sentenced to death on the
unanimous recommendation of a jury, Darnell Williams has had those
convictions and the sentence reviewed on the merits once by a state trial
court in the first post-conviction proceeding, twice by this Court on
appeal, and by all three levels of the federal judiciary. The United
States Supreme Court has three times declined to hear the case.

 More recently, Williams petitioned for relief under Indiana Code
section 35-50-2-9(k) (Supp. 2003), which generally provides an avenue for a
person sentenced to death to present previously undiscovered evidence that
undermines the confidence in the conviction or death sentence. That
petition also asserted claims outside the framework of what could
reasonably be called previously undiscovered evidence, and we considered
those claims as another request for successive post-conviction relief. We
denied the relief requested in the petition.

 Now pending before us is a request to reconsider the denial of that
petition. For the reasons explained below, we deny the request for
rehearing. To the extent that Williams has submitted additional evidence
or raised additional claims for relief not raised in his earlier petition,
we deny those requests for relief. Williams has also filed several
requests to supplement the record with additional materials, all of which
we grant. Williams has also filed a motion asking for funds to conduct
additional investigation, which we deny.

 Having disposed of all pending matters, we have entered a separate
order today setting the date for execution of the death sentence for July
9, 2004, before sunrise.

 Background.

 Williams stands convicted of two counts of felony murder for two
killings committed in the course of a robbery. See Ind. Code § 35-42-1-
1(2) (“A person who . . . kills another human being while committing or
attempting to commit . . . robbery . . . commits murder, a felony.”). As
the aggravating circumstances that made Williams eligible for the death
penalty, the State alleged two intentional killings during a robbery and
the multiple murders. See I.C. § 35-50-2-9(b)(1)(G) & (8). The jury
unanimously recommended the death penalty and the Lake Superior Court
followed that recommendation by sentencing Williams to death. See I.C. §
35-50-2-9(e) (1986).

 Williams was tried with Gregory Rouster (who has changed his name to
Gamba Rastafari). Rouster was also convicted of two counts of felony
murder and sentenced to death, but he has since been found to be mentally
retarded and thus ineligible for the death penalty under Atkins v.
Virginia, 536 U.S. 304 (2002). See Rastafari v. State, Lake Superior Court
case no. 2CR-133-886-531 (June 16, 2003 order of the post-conviction
court). The victims, John Rease, age 74, and his wife, Henrietta Rease,
age 59, had been foster parents to Rouster. They were found in the bedroom
of their home on August 12, 1986, dead from gunshot wounds. The apparent
motive was Rouster’s belief that the Reases owed him money they had
collected as his foster parents. Two others were also charged in
connection with the killings and robbery. Theresa Newsome was acquitted.
Edwin Taylor pled guilty to robbery, and he testified for the State, but
the charges against him may have been dismissed later.

 Williams has received the review of his convictions and sentence to
which he is entitled as a matter of right. The convictions and sentence
were affirmed on direct appeal in Rouster v. State, 600 N.E.2d 1342 (Ind.
1992), reh’g denied, (Ind. 1993). In the first post-conviction proceeding,
Williams, represented by the same attorney as in this proceeding, alleged
more than one hundred collateral errors in his case. Post-conviction
relief was denied, however, and that denial was affirmed on appeal in
Williams v. State, 706 N.E.2d 149 (Ind. 1999), cert. denied, 529 U.S. 1113
(2000). The federal courts denied a petition for a writ of habeas corpus.
Williams v. Anderson, 174 F. Supp. 2d 843 (N.D. Ind. 2001), aff’d, Williams
v. Davis, 301 F.3d 625 (7th Cir. 2002), cert. denied, 123 S.Ct. 1904
(2003).

 In the time since then, Williams has filed several petitions in this
Court. First, Williams tendered a successive post-conviction petition
requesting that we order DNA testing for certain blood evidence. Although
we acknowledged that DNA testing can provide important information in
appropriate circumstances, we concluded that even a test result favorable
to Williams would not raise questions sufficient to afford him relief on
the murder conviction or the appropriateness of the death sentence given
the other evidence in the case. We denied the request for DNA testing.
See Williams v. State, 791 N.E.2d 193 (Ind. June 27, 2003) (Order
Concerning Successive Petition For Post-Conviction Relief In Capital Case),
reh’g denied, cert. denied, 124 S. Ct. 300 (2003). Execution of the
sentence was ordered for August 1, 2003.

 Williams then filed a petition for relief citing a new statute that
directs us to consider a capital prisoner’s claim that “previously
undiscovered evidence . . . undermines confidence in the conviction or the
death sentence.” See I.C. § 35-50-2-9(k) (Supp. 2003). The purported new
evidence relates to the credibility of Derrick Bryant, a trial witness who
places Williams inside the house during the shootings; to a statement by
Elliott Streeter that was partially favorable to Williams; to testimony
from Kimberly Epperson, the state serologist; and to statements about the
death sentence by T. Edward Page, the magistrate who presided over the
first post-conviction proceeding, Thomas Vanes, the former deputy
prosecutor who tried the case for the state, and John Gnajek, a juror.
Other claims were not based strictly on “previously discovered evidence,”
and we considered those under our rules governing successive post-
conviction petitions.

 We denied the “Petition for the Consideration of New Evidence
Pursuant to Indiana Code 35-50-2-9(k).” See Williams v. State, 793 N.E.2d
1019 (Ind. July 25, 2003) (published order), reh’g pending.

 Williams immediately petitioned for rehearing from that denial order,
but before we ruled, Williams was granted a reprieve by then-Governor Frank
O’Bannon, which reprieve was later extended by Governor Joseph E. Kernan,
to conduct DNA testing on blood evidence. See Statement Regarding Darnell
Williams (July 28, 2003); Statement Regarding Darnell Williams (Sept. 29,
2003). In light of the reprieve, we stayed enforcement of the order
setting execution of the sentence for August 1, 2003. See Order, entered
in this case July 29, 2003.

 After the DNA testing authorized by the Governor as part of the
clemency proceeding had been completed and the Governor’s reprieve had
expired by its own terms, we issued an order directing the parties to
submit any additional materials they wanted us to consider before we took
action on the pending petition for rehearing and further action on the
State’s motion to set an execution date.

 In the time since we issued an order staying the execution and today,
both sides have filed various documents, and we have considered them
all.[1]

 Request to supplement the record.

 Williams has filed several motions requesting permission to
supplement the record with various exhibits. See “Motion to Supplement
Record for Consideration of New Evidence Pursuant to 35-50-2-9(k)” filed
July 29, 2003 (relating to Vanes’ testimony); “Supplemental Record &
Supplement to Motion to Reconsider Petition for the Consideration of New
Evidence Pursuant to Indiana Code 35-50-2-9(k)” filed September 4, 2003
(containing documents marked Exhibits A (letter from T. Edward Page to the
parole board), Exhibit B (testimony of former deputy prosecutor Vanes
before the parole board), Exhibit C (letter from juror Gnajek), Exhibit D
(affidavit of Vanes), Exhibit E (unsworn statement of Anita Kelly, the aunt
of trial witness Derrick Bryant), Exhibit F (unsworn statement of Bertha
King)); “Second Supplement to the Record” filed September 26, 2003
(containing records from Southlake Center for Mental Health about trial
witness Bryant); “Request For Leave To Submit Additional Exhibit In Support
of Supplemental Motion For Reconsideration of Petition For Relief Under
I.C. 35-50-2-9(k)” filed May 11, 2004.

 Those requests are GRANTED. Various other documents have been
attached to the papers Williams has filed in this cause. We have
considered these.

 In addition, Williams moved for leave to file a reply and
simultaneously tendered a “Reply to State’s Response in Opposition to
Williams’s Supplemental Motion For Reconsideration of His Petition for
Relief Under I.C. 35-50-2-9.” The motion is GRANTED, and the Clerk is
directed to show the Reply filed as of the date it was tendered. The State
filed “State’s Motion to File Oversized Response,” which is also GRANTED.
The Clerk has shown the response filed as of the date it was presented,
April 23, 2004.

 Request for additional investigation.

 Williams has filed a motion, ex parte and under seal, requesting that
we authorize funds for him to hire investigators and experts. Among other
things, Williams desires to locate witnesses and gather evidence of his own
mental capacity. See “Ex Parte Request For The Court’s Assistance To
Complete Investigation For Post-Conviction Proceedings By A Person Under A
Sentence Of Death” filed March 29, 2004, and “Notice To The Court” filed
April 2, 2004.

 Indiana law provides legal representation and investigation funds to
indigent defendants for trial and to indigent prisoners for prosecution of
a first post-conviction proceeding. Counsel correctly notes, however, that
no provision is made for funding successive post-conviction proceedings
until the prisoner has met the requirement of demonstrating a “reasonable
possibility” of entitlement to relief.

 Because Williams has not made the required showing, the ex parte
request for funds is DENIED.

 Indiana’s post-conviction rules and the framework for analyzing
 the claims made in this rehearing proceeding.

 As noted above, Williams requests relief based on a new provision in
Indiana’s death penalty statute. The statute states:

 A person who has been sentenced to death and who has completed state
 post-conviction review proceedings may file a written petition with
 the supreme court seeking to present new evidence challenging the
 person’s guilt or the appropriateness of the death sentence if the
 person serves notice on the attorney general. The supreme court shall
 determine, with or without a hearing, whether the person has presented
 previously undiscovered evidence that undermines confidence in the
 conviction or the death sentence. If necessary, the supreme court may
 remand the case to the trial court for an evidentiary hearing to
 consider the new evidence and its effect on the person’s conviction
 and death sentence. The supreme court may not make a determination in
 the person’s favor nor make a decision to remand the case to the trial
 court for an evidentiary hearing without first providing the attorney
 general with an opportunity to be heard on the matter.

I.C. § 35-50-2-9(k) (Supp. 2003).

 This statute limits our consideration to claims involving “previously
undiscovered evidence.” To the extent the claims presented fit this
category, we analyze them using the language of the new statute.

 To the extent Williams presents other claims, we apply the rules
which permit a convicted person who has already completed one state post-
conviction relief proceeding to request a successive opportunity for post-
conviction relief. See Ind. Post-Conviction Rule 1 (12)(a). We will
authorize the filing of a successive post-conviction petition

 if the petitioner establishes a reasonable possibility that the
 petitioner is entitled to post-conviction relief. In making this
 determination, the court may consider applicable law, the petition,
 and materials from the petitioner’s prior appellate and post-
 conviction proceedings including the record, briefs and court
 decisions, and any other material the court deems relevant.

P-C.R. 1 (12)(b).

 Post-conviction procedures do not afford a petitioner with a “super-
appeal.” See, e.g., Timberlake v. State, 753 N.E.2d 591, 597 (Ind. 2001).
Rather, subsequent collateral challenges must be based on grounds
enumerated in Post-Conviction Rule 1. If an issue was known and available
on direct appeal, but not raised, it is procedurally defaulted as a basis
for relief in subsequent proceedings. See, e.g., Rouster v. State, 705
N.E.2d 999, 1003 (Ind. 1999). If an issue was raised on appeal, but
decided adversely, it is res judicata. Id. If the issue is not raised on
direct appeal, a claim of ineffective assistance of trial counsel is
properly presented in a post-conviction proceeding, but as a general rule,
“most free-standing claims of error are not available in a postconviction
proceeding because of the doctrines of waiver and res judicata.”
Timberlake, 753 N.E.2d at 597-98.

 The claims.

 1. No new evidence renders the convictions or death sentence unreliable.

 a. The DNA evidence, while new, does not call into question the
 participation of Williams in the murders.

 The shorts Williams was wearing when he was arrested had three small
spots of blood on the front near the inseams. Trial Record, pp. 1953; 1967-
68. The state serologist, Kimberly Epperson, performed enzyme testing on
the spots. She testified at trial that the blood type on the shorts was
consistent with the blood of Mr. and Mrs. Rease, as well as Rouster. T.R.
pp. 1967, 1981-82. She acknowledged that a blood type "match" did not
indicate that the blood on the shorts necessarily was that of any of those
three people. T.R. pp. 1701, 1985. She noted that forty-five per cent of
the world's population has the same blood type as that found on the shorts.
 Id. at 1987-88.

 The pants Edwin Taylor was wearing had a large amount of blood on
them, but pre-trial enzyme testing apparently yielded no usable results.

 These blood samples were subjected to DNA testing in late 2003 at the
Governor’s direction in clemency proceedings. A report from Mitotyping
Technologies, LLC, dated December 9, 2003, was submitted to us as an
attachment in the “Reply to the Court’s Order” filed March 29, 2004.

 The report states that Mrs. Rease was excluded as a source of any of
the blood samples. Mr. Rease was excluded as a source of one spot of
blood on the shorts and the blood on Taylor’s pants. Mr. Rease could not
be excluded as a source for the second spot of blood on the shorts, labeled
by the tester as Sample 2361Q2. The report states that this sample:

 showed a mixture of two or more mtDNA types. For sample 2361Q2, the
 number of possible types in the mixture is 65,536, based on the
 presence of 16 mixed sites with two nucleotides in each (all of these
 types are not equally probable). The data observed in the analysis of
 the 2361Q2 stain cutting supports a conclusion that the mtDNA type of
 John Rease (2361K1) is not excluded as one of the many possible types
 that may be generated from the mixture observed in 2361Q2.

In addition, the report states:

 Each of the questioned stain cuttings that were analyzed for
 mitochondrial DNA produced a mixture of two or more mitochondrial DNA
 types. This result is highly characteristic of this type of sample
 (stain or fabric, swab, swatch, or cutting). When a mixture profile
 is obtained, the number of potential mitochondrial DNA types that may
 be derived from that mixture is equal to 2ⁿ types where n is equal to
 the number of nucleotide positions at which two different nucleotides
 have been observed. The only possible conclusion that may be drawn
 from a mixture where the type of a known individual is present in that
 mixture is “the profile of this known individual is one of many
 possible profiles that may be derived from the nucleotide
 substitutions observed in the mixture.” Many caveats apply to the
 handling of mixtures in mitochondrial DNA.

 When Williams requested the DNA testing, his theory was as follows:
Evidence at trial showed that the blood on the shorts was the same blood
type as that of the victims. A favorable DNA test would show that the
blood on the shorts did not come from either victim. Without the blood
evidence, only “circumstantial evidence” implicates Williams in the
murders. The jury and trial court relied heavily on the blood evidence
when recommending and imposing the death sentence. If there is no link
between the blood on the shorts and the victims, the death sentence should
be vacated.

 The DNA test results do seem to establish that the blood on the
shorts could not have come from Mrs. Rease, but Mr. Rease is not excluded
as a possible source. In an apparent attempt to minimize this test result,
Williams suggests that the testers could not make “a firm scientific
conclusion” that the blood was Mr. Rease’s. This may or may not be true,
but the point is that Williams has not provided any meaningful analysis of
this test result or its significance to his case.

 In fact, what the DNA test results seem to show is not that much
different from what was presented at trial. It is true that the jury was
told the blood was consistent with Mrs. Rease’s blood type, and the DNA
test shows otherwise. But the jury was also told that the blood was
consistent with Mr. Rease’s blood type, and the DNA test does not seem to
eliminate that possibility. Williams attacked the blood evidence at trial
by noting the State’s failure to produce an expert to testify about how the
blood came to be on the shorts, and by noting the blood could have come
from “millions of people” other than the victims or from some place other
than their house. T.R. pp. 2550, 2594-95, quoted in Williams, 706 N.E.2d
at 156. Given our understanding of the DNA test results, this would not be
an unreasonable trial strategy today with respect to Mr. Rease.

 We denied the request for DNA testing because we rejected the premise
that the absence of blood from the victims on the shorts would confirm or
negate his guilt for the murders. We still conclude that, given the other
overwhelming evidence of guilt, the DNA test results do not undermine
confidence in the conviction or the death sentence.

 Numerous witnesses place Williams in the house when the shootings
occurred, and the evidence shows beyond doubt that Williams participated.
As described by the Seventh Circuit, Derrick Bryant’s testimony linked
Williams with the murders:

 Derrick Bryant, a seventeen-year-old foster child who lived with the
 Reases at the time that the crimes were committed, testified that when
 Williams and Rouster got to the house, they went into a back room
 with Henrietta Rease and got into an argument with her about whether
 the Reases owed Rouster money. After Henrietta Rease asked Rouster to
 leave the house, Bryant heard Williams say, “I won't let her, she’s
 doing nothing but gypping [Rouster] out of the money.” Bryant then
 heard a series of gunshots and went upstairs into the attic to hide.
 While in the attic, Bryant heard a conversation take place between
 Williams, Rouster, and Taylor, whereby Williams and Rouster agreed to
 rob the Reases at gunpoint. Bryant then ran downstairs to hide behind
 a stairway and heard Williams and Rouster bring the Reases into the
 bedroom, at which point Henrietta Rease told Williams not to hit John
 Rease. Next, Bryant heard Williams state, “it's your time” and heard
 Rouster reply, “waste them.” Bryant then heard a second series of
 gunshots coming from the bedroom, at which point he ran out of the
 house and flagged down a police car.

Williams, 301 F.3d at 627. Other witnesses corroborated Bryant’s testimony
about the gunshots when Williams and Rouster were inside the house. Id.
Witnesses other than Bryant testified about a third set of shots from the
house when Rouster was outside the house, but while Williams presumably was
still inside the house. Id. Although no witness actually testified that
Williams was in the house when the third group of shots was fired, the
Seventh Circuit noted:

 [T]he only time that Williams was seen leaving the house was after the
 first series of gunshots, when Williams searched for something in the
 front yard and exclaimed, “my shells.” Powell and Pope then saw
 Williams re-enter the house, and they then heard the second series of
 gunshots.

Id. n.3. There was no trial testimony that Williams left the house before
the third series of gunshots. Id.

 The evidence described above is sufficient to establish the
aggravating circumstances that made Williams eligible for the death
penalty, whether or not Williams was the actual shooter. See Tison v.
Arizona, 481 U.S. 137, 158 (1987) (establishing that “major participation
in the felony committed, combined with reckless indifference to human life”
satisfies the constitutional requirement); Rouster, 600 N.E.2d at 1350 (“At
the very least, the facts clearly show that Williams’ participation in the
felonies was major and that his conduct displayed reckless indifference to
human life.”). Williams does not argue otherwise in this proceeding.

 We are not alone in concluding that evidence other than that relating
to blood is sufficient to support the death penalty. As the Seventh
Circuit wrote:

 [T]he trial judge and jury were well-informed of the fact that the
 blood found on Williams’ shorts could have come from somewhere other
 than the crime scene. For example, Epperson testified that the blood
 was consistent with the blood of 45% of the population, and thus her
 testimony showed that there were millions of potential sources of the
 blood other than the Reases or Williams. Indeed, Williams’ counsel
 seized on this point during closing arguments to note that the blood
 found on Williams’ shorts could have come from “millions of people.”
 Further, Williams’ counsel also stated during closing arguments that
 the State did not present a “splatter” expert, and therefore, the
 State failed to show that the blood came from the crime scene.
 Finally, Lach conceded at trial that he observed Williams’ clothing on
 the night that he was arrested, but did not see any blood on it, thus
 creating a potential inference that the blood got onto Williams’
 shorts sometime after Lach observed them but before his clothing was
 confiscated three days later. Therefore, we agree with the Indiana
 Supreme Court that the facts about which Williams argues competent
 counsel would have presented at trial were in fact known by the jury
 when it recommended the death penalty--and by the trial judge when he
 sentenced Williams to death.

 More importantly, however, Williams was not prejudiced because even
 without the blood evidence, he still would have been sentenced to
 death. Bryant testified that Williams and Rouster agreed to rob the
 Reases at gunpoint, that Williams encouraged Rouster by telling him
 not to let the Reases “gyp” him out of the money, and that Williams
 also threatened the Reases physically. Bryant also heard Williams say
 “it's your time” followed by Rouster saying “waste them,” and then
 heard several gunshots. Further, Taylor testified during the
 sentencing hearing that Williams threatened the Reases, pointed a gun
 at Taylor and asked him where the Reases kept their money, and was the
 last person he saw with a gun. In addition, the police found .30
 caliber cartridges on Williams and in the Reases' bedroom on the night
 of the murders as well as $232.00 in cash in Williams’ pouch.
 Finally, the neighborhood teenagers testified that they heard a third
 series of gunshots when Williams was still inside of the Reases’
 house, but while Rouster was in the Reases’ front yard talking to
 Newsome. The fact that witnesses heard gunshots coming from inside of
 the house when Rouster and Newsome were outside is strong
 circumstantial evidence that Williams fired a gun that night.

 The cumulative effect of the above-described evidence is that Williams
 planned the robbery with Rouster, actively participated in the robbery
 and the murders, and that either Williams or Rouster (or both) fired
 the gunshots that killed the Reases. Thus, the evidence—excluding the
 blood evidence—was sufficient to support the presence of the three
 aggravating circumstances found by the trial judge.

Williams, 301 F.3d at 632-33 (emphasis added).

 The DNA evidence does not undermine our confidence in the conviction
or the death sentence. It does not establish that Williams did not shoot
either of the Reases or that he is “innocent” of the aggravating
circumstances required for a death sentence.

 We noted in earlier orders denying DNA testing that counsel for
Williams had known for some time that DNA testing was a possible avenue of
relief, yet he did not appeal the federal district court’s denial of a
request for testing in 2001, and he waited until he was faced with a final
execution date to raise the issue in state court. Now that the testing has
been done, Williams devotes little space in his numerous papers to
explaining how the test results are evidence that he was not a participant
in the murders or to explaining the significance of the result with respect
to Mr. Rease. The argument regarding the DNA seems to have fallen away in
this proceeding, yielding to the attorney’s focus on other evidence. The
testing has been done, but no satisfactory explanation about how it matters
to the conviction and sentence has been presented.

 To the extent this claim involves previously undiscovered evidence,
the evidence does not undermine confidence in the convictions or the death
sentence given the weight of the other evidence and the level of judicial
scrutiny applied by the courts that have reviewed this case. See I.C. § 35-
50-2-9(k) (Supp. 2003). To the extent Williams asserts claims that involve
the consideration of matters other than previously undiscovered evidence,
he has not established a reasonable possibility that he is entitled to post-
conviction relief. See P-C.R. 1(12)(b).

 b. The serologist’s testimony does not render the conviction or
 sentence unreliable.

 Williams asserts that he is entitled to relief because the state’s
serologist, Kimberly Epperson, gave “false testimony” at trial. As
indicated, Epperson testified that the testing she had performed showed the
blood on the shorts was the same blood type as Mrs. Rease’s. The
implication was that the blood spots might have been from Mrs. Rease. The
DNA test report, however, indicates that the blood could not have come from
her.

 We are not convinced that this entitles Williams to relief from the
conviction or sentence, however. Epperson’s testimony was one piece of
evidence in the course of the entire trial. Given the other evidence of
guilt and eligibility for the death sentence outlined above and in the
several court decisions in this case, we are simply not persuaded that
Williams has presented anything that undermines confidence in the
conviction or the death sentence or that Williams has established a
reasonable possibility that he is entitled to post-conviction relief.

 To the extent this claim involves previously undiscovered evidence,
the evidence does not undermine confidence in the convictions or the death
sentence given the weight of the other evidence and the level of judicial
scrutiny applied by the courts that have reviewed this case. See I.C. § 35-
50-2-9(k) (Supp. 2003). To the extent Williams asserts claims that involve
the consideration of matters other than previously undiscovered evidence,
he has not established a reasonable possibility that he is entitled to post-
conviction relief. See P-C.R. 1(12)(b).

 c. The evidence concerning Derrick Bryant is either not new or
 does not undermine confidence in the conviction or sentence.

 Williams devotes substantial effort to the contention that new
evidence about witness Derrick Bryant renders the conviction and sentence
unreliable. Williams contends that the statements and records he has
recently submitted show that Bryant had mental health problems and a
reputation for lying such that his testimony incriminating Williams was not
worthy of belief. Bryant is dead.

 The materials include unsworn statements from Anita Kelly, Bryant’s
aunt, and Bertha King, Bryant’s grandmother, to the effect that Bryant had
lied in the past. There are also records from Southlake Center for Mental
Health prepared about a year before the murders, indicating that Bryant had
difficulty in accurately perceiving the meaning of events. Finally,
Williams has submitted records from Hartgrove Hospital to which Bryant was
admitted the day after the murders for psychiatric treatment.

 Williams argues that the jury should have been advised about these
matters, and that had it been, Williams would not have been convicted or
sentenced to death. We conclude that none of this information is the type
of previously undiscovered evidence that undermines confidence in the
convictions or the death sentence.

 The evidence is not new. As indicated in our Order of July 25, 2003,
defense counsel raised the issue of Bryant’s mental health at trial.
Counsel’s request for production of welfare records containing
psychological information was denied. T.R., p. 2076. That ruling was not
raised as an issue in any of his previous appeals to us. Also discussed at
trial was counsel’s intention to present evidence concerning Bryant’s
reputation for truthfulness through trial witness Jack Baumer, a social
worker. Objections to defense counsel’s initial attempts to elicit this
information were sustained. T.R., p. 842. Baumer was recalled later, but
the record does not show that he was examined concerning Bryant’s
reputation for truthfulness.

 The records from Hartgrove Hospital may be evidence newly acquired by
Williams, but they do not undermine confidence in the convictions or the
sentence. Williams identifies two statements in the records, attributed to
Bryant, that Williams claims indicate Bryant gave false information about
the murder.

 The first statement is: [Patient] “States here in hospital for
protection against friends who ‘killed his foster parents.’ He knows who
killed the parents but can’t tell authorities.” See “Supplemental Motion
to Reconsider Petition For Consideration of New Evidence” filed April 20,
2004, Exhibit A. Williams contends that the first statement amounts to
Bryant’s “disavowing his statement to police” that Williams was involved in
the murders. Williams reasons that since Bryant had already told police
Williams participated in the murders, Bryant must have been admitting to
hospital officials that Bryant had not told the police the truth. But the
statement seems completely ambiguous in this regard without further
explanation.

 The second statement is: “I saw my friend kill my foster parents.
‘Ed and his friends’ performed the crime.” Id., Exhibit B. Williams
reasons that Bryant could not have been referring to Williams because the
two were not friends. Therefore, Williams suggests, Bryant must have meant
that he saw Edwin Taylor commit the murder. Even assuming that the
statement refers to Taylor, this is not new evidence as Taylor’s role in
the robbery has been established. Furthermore, as the State points out, no
witness puts Taylor inside the Rease home during the shootings.

 We are simply not persuaded that this or any other information cited
in the Hartgrove Hospital records is new evidence that undermines
confidence in the conviction or sentence.

 We also reject the legal claims Williams asserts with respect to the
information about Bryant. The claim that trial counsel was ineffective for
not obtaining the information before trial is procedurally defaulted
because the claim was not raised in the previous appeals to us. See, e.g.,
 Stevens v. State, 770 N.E.2d 739, 746 (Ind. 2002) (“It is well settled
that issues which are not raised either at the trial level, on appeal, or
in a post-conviction petition are waived.”), cert. denied, 124 S.Ct. 69
(2003).

 We note that Williams presented at least some material to the federal
district court in the habeas proceeding, where he argued that the
prosecutor engaged in misconduct by not disclosing Bryant’s mental health
history, but he lost that claim through procedural default. See Williams,
174 F. Supp. 2d at 875 (citing O’Sullivan v. Boerckel, 526 U.S. 838
(1999)). Williams asserts that he sought an order from the district court
compelling Hartgrove Hospital to produce its records, but it does not
appear that he appealed the unfavorable ruling to the Seventh Circuit.

 The claim that the trial court should have ordered the production of
records relating to Bryant may have been appropriate for direct appeal, but
it was not raised until these successive post-conviction proceedings. It
is procedurally defaulted. See, e.g., Stevens, 770 N.E.2d at 746.

 The claim that prosecutors withheld exculpatory evidence is also
procedurally defaulted for not having been raised earlier. In any event,
there is nothing before us suggesting that the prosecutors possessed or
had the authority to release records concerning Bryant or even that such
information would have been exculpatory under Brady v. Maryland, 373 U.S.
83 (1963) or Kyles v. Whitley, 514 U.S. 419, 434 (1995).

 The claim that the State failed to correct Bryant’s so-called false
testimony is without merit absent any credible indication that Bryant gave
false testimony.

 The statements from Bryant’s relatives are not submitted under oath
and seem to be otherwise inadmissible on hearsay or relevancy grounds.

 To the extent the evidence submitted involves anything that could be
characterized as previously undiscovered evidence, given the weight of all
the other evidence in this case and the level of judicial scrutiny applied
by the state and federal courts that have repeatedly reviewed this case, we
conclude that Williams has not presented anything that undermines
confidence in the conviction or the death sentence. See I.C. § 35-50-2-
9(k) (Supp. 2003). To the extent Williams asserts claims that involve the
consideration of matters other than previously undiscovered evidence, he
has not established a reasonable possibility that he is entitled to post-
conviction relief. See P-C. R. 1(12)(b).

 d. Elliott Streeter’s statement is not new evidence.

 Streeter gave a statement that put Williams outside the house when
some of the shooting occurred. A copy of the statement was filed here as
Exhibit D in the “Submission of Habeas Exhibits” received June 20, 2003.

 In this respect, the statement may contradict some of the damaging
trial testimony of Bryant. The argument seems to be that given the “new
evidence” concerning Bryant’s credibility and the DNA test results,
Streeter’s statement becomes stronger evidence that Williams was not
involved in the murders.

 Williams is not entitled to relief with respect to Streeter’s
statement for several reasons. The statement is not previously
undiscovered evidence that undermines confidence in the conviction or the
death sentence. The statement was disclosed to counsel before trial.
T.R., p. 24A.

 In addition, the relative importance of the statement has already
been litigated. Williams argued in the first post-conviction proceeding
that his attorney should have called Streeter as a witness. Williams lost
that claim. Post-Conviction R., p. 1320-21. The post-conviction court
found that Streeter’s testimony “would not have been sufficient to rebut
the testimony of the other eyewitnesses who put the petitioner in the house
at critical points during the robbery and killings.” Id. at 1321.
Furthermore, the post-conviction court concluded, Williams failed to
establish that Streeter’s testimony was credible or could have been
produced at trial. Id. Williams apparently did not think this issue
important enough to raise in his appeal to us. See Williams, 706 N.E.2d
149. Williams raised the claim in the federal habeas proceeding, but lost.
 See Williams, 174 F. Supp. 2d at 867 (finding issue to be procedurally
defaulted in the habeas proceeding under O’Sullivan v. Boerckel, 526 U.S.
838).

 We remain unconvinced that Streeter’s statement undermines confidence
in the conviction or the death sentence. Some parts of the statement
incriminate Williams. The statement itself is not signed or sworn, and as
such is presently inadmissible hearsay, and Williams has made no showing
that Streeter would be available to testify.

 To the extent the evidence submitted involves anything that could be
characterized as previously undiscovered evidence, given the weight of all
the other evidence in this case and the level of judicial scrutiny applied
by the state and federal courts that have repeatedly reviewed this case, we
conclude that Williams has not presented anything that undermines
confidence in the conviction or the death sentence. See I.C. § 35-50-2-
9(k) (Supp. 2003). To the extent Williams asserts claims that involve the
consideration of matters other than previously undiscovered evidence, he
has not established a reasonable possibility that he is entitled to post-
conviction relief. See P-C. R. 1(12)(b).

 2. The sentence is not disproportionate, excessive or otherwise
 unlawful.

 Williams presents various legal claims that the death sentence is
inappropriate for him. The claims raised in his petition for consideration
of new evidence were addressed in our Order denying the petition. See
Williams, 793 N.E.2d 1019. We have considered the various matters raised
in the papers Williams has filed since then, but again we conclude that the
death sentence is not disproportionate, excessive or otherwise unlawful
under Article I, section 16, and Article VII, section 4 of the Indiana
Constitution, Indiana Appellate Rule 7(B), or the Eighth and Fourteenth
Amendments to the United States Constitution.
.
 a. Williams received an individualized sentencing determination.

 Williams and co-defendant Rouster were sentenced to death, but
Rouster’s sentence was vacated last year upon the finding that he is
mentally retarded within the meaning of Atkins v. Virginia, 536 U.S. 304
(2002). See Rastafari, case no. 45S00-0210-SD-510 (June 16, 2003 order of
the post-conviction court). The claim is that the death sentence for
Williams is disproportionate because he is less culpable than Rouster.

 As we have already indicated, the vacating of Rouster’s death
sentence because he is mentally retarded has no bearing on the lawfulness
of the sentence Williams received. Williams is entitled to an
individualized sentencing determination. See Williams, 706 N.E.2d at 159
(citing Zant v. Stephens, 462 U.S. 862, 879 (1983)); Rouster, 600 N.E.2d at
1350-51. This is what he received. The evidence shows that he took an
active role in the murders.

 Williams claims that Rouster’s being mentally retarded calls into
question the proof of an intentional murder, which was a charged
aggravating circumstance that made Williams eligible for the death penalty.
 Williams asserts, without citation to any authority, that Rouster is
conclusively presumed unable to formulate intent sufficient to be subject
to the death penalty. See Pet. for Reh’g, at 3. From that, Williams
posits that he could not be found guilty of an intentional murder
physically committed by Rouster, and because no one can know whether the
jury recommended the death penalty for Williams because it found he had
committed an intentional murder, the death sentence must be vacated.

 We need not decide whether the legal premise concerning transferred
intent is correct because the assertion that there is no “requisite factual
predicate to support the death sentence” is plainly wrong. Williams was
convicted, on evidence beyond a reasonable doubt, of multiple murders. The
commission of multiple murders is an aggravating circumstance that will
support a death sentence. See I.C. § 35-50-2-9(b)(8). Therefore, there is
an aggravating circumstance to support the death sentence independent of
any intent on Rouster’s part.

 b. Williams is not entitled to relief under Appellate Rule 7(B).

 Williams invokes Appellate Rule 7(B) which provides that we “may
revise a sentence authorized by statute if, after due consideration of the
trial court’s decision, the Court finds that the sentence is inappropriate
in light of the nature of the offense and the character of the offender.”
Ind. Appellate Rule 7(B).

 We reviewed the appropriateness of the sentence in the direct appeal.
 See Rouster, 600 N.E.2d at 1350-51. We considered again the evidence
supporting the sentencing in the course of ruling on the petition for DNA
testing. See Williams, 793 N.E.2d at 1026-27. We decline to review the
sentence at this stage.

 c. The opinions of various private citizens do not demonstrate
 that Williams is “undeserving” of the death penalty or
 establish any “change in the legal landscape.”

 Williams has submitted the views of various individuals that Williams
should not be executed. As a deputy prosecutor in 1987, Thomas Vanes tried
the case against Williams. Vanes now represents defendants in criminal
matters. In various forums, Vanes has expressed his current view that the
death penalty likely would not be requested if the case were prosecuted
today and that Williams should not be executed if Rouster is not because
Rouster was the more culpable defendant. The view that Williams should not
be executed if Rouster is not has also been expressed by T. Edward Page,
the magistrate who presided over the first post-conviction hearing and who
now represents defendants in criminal matters. At least one juror has also
expressed this view. These opinions were submitted to the Governor in the
course of clemency proceedings.

 As we indicated previously, the views of these individuals
simply do not constitute previously undiscovered evidence that
undermines the confidence in the conviction or the death sentence.

 Williams argues that his case is “unique and disproportionate”
because there is no other case in Indiana where one defendant is executed
while the more culpable co-defendant was not. Whether or not true,
Williams has not demonstrated that his is a “unique and disproportionate”
sentence that the law prohibits under Cooper v. State, 540 N.E.2d 1216,
1220 (Ind. 1989), or any other judicial precedent.

 d. The death sentence does not violate Ring v. Arizona.

 We have previously rejected the claim that the death sentence
violates the evidentiary requirements of Ring v. Arizona, 536 U.S. 584
(2002). Williams adds to his prior claim only by citing Summerlin v.
Stewart, 341 F.3d 1082 (9th Cir. 2003), cert. granted,124 S.Ct. 833 (2003).

 We decline to grant rehearing on this claim. As we indicated, the
convictions for the two murders shows that the multiple-murder aggravating
circumstance was proved beyond a reasonable doubt, which is sufficient to
support the death sentence. See Pope v. State, 737 N.E.2d 374, 381 (Ind.
2000) (jury’s unanimous verdict in guilt phase, which found defendant
guilty of multiple felony murders, constitutes a finding beyond a
reasonable doubt of the existence of multiple murder aggravating
circumstance; affirming sentence imposed under I.C. § 35-50-2-9). In
addition, we have previously held that Ring does not require specific
verdict forms, and that when the jury receives an instruction like the one
the jury received here, there is compliance with the mandate of Ring. See
Overstreet v. State, 783 N.E.2d 1140, 1161 (Ind. 2003), cert. denied, 124
S.Ct. 1145 (2004).

 e. Atkins v. Virginia does not afford Williams relief.

 To the extent Williams asserts a claim that he is mentally retarded
within the meaning of Atkins, 536 U.S. 304, we fully addressed that claim
in our July 25, 2003 order. Williams has not submitted any additional
evidence or new argument on this claim. Therefore, he is entitled to no
relief on this claim.

 Conclusion.

 With respect to all of the claims Williams has presented, to the
extent the evidence submitted involves anything that could be characterized
as previously undiscovered evidence, given the weight of all the other
evidence in this case and the level of judicial scrutiny applied by the
state and federal courts that have repeatedly reviewed this case, we
conclude that Williams has not presented anything that undermines
confidence in the conviction or the death sentence. See I.C. § 35-50-2-
9(k) (Supp. 2003). To the extent Williams asserts claims that involve the
consideration of matters other than previously undiscovered evidence, he
has not established a reasonable possibility that he is entitled to post-
conviction relief. See P-C.R. 1(12)(b).

 The petition for rehearing and subsequently-filed requests for
substantive relief from the conviction and sentence are DENIED.

 The Clerk is directed to certify this matter as final, and to send a
copy of this order to all counsel of record.

 DONE AT INDIANAPOLIS, INDIANA, this _____ day of May, 2004.

 _________________________
 Randall T. Shepard
 Chief Justice of Indiana

Dickson, Sullivan and Rucker, JJ., concur. Boehm, J., concurs in result
with separate opinion.

Boehm, J., concurring in result.

 I have no doubt that the State has established that Williams was
properly convicted of these murders. However, the blood on Williams’s
shorts was cited as evidence that Williams was the shooter, not merely a
participant in these executions. As I explained in dissenting from the
Court’s July 27, 2003, order denying Williams’s request to present
additional evidence, if it could be established that the blood was not from
either victim, it would undermine my confidence that the jury would have
recommended the death penalty.

 We now have a report of DNA testing, but no explanation from Williams
as to its significance. The State, also without elaboration, claims the
test is “not as favorable as Williams hoped.” The DNA test results
establish that the blood on the shorts could not have come from Mrs. Rease,
but report that Mr. Rease is “not excluded” as a possible source. Although
it is common in reports of DNA tests to assign a probability to the
likelihood of a match, this report included no probability that the sample
was Mr. Rease’s blood. We are given no explanation what inability to
“exclude the possibility” as used in this report means in practical terms.
The report’s language as a matter of ordinary English could mean everything
from there is only one chance in a very large number that the blood came
from Mr. Rease, to there is a high probability it did come from Mr. Rease,
but absolute certainty is not established. The only inference I can draw
from Williams’s silence on these points is that the State is correct in its
assertion that the test does not support Williams’s claim.

 In an apparent attempt to minimize this test result, Williams says
that the testers could not make “a firm scientific conclusion” that the
blood was Mr. Rease’s. I do not believe this is a meaningful proposition.
I take the report’s “inability to exclude” to mean that the test did not
yield absolute certainty that the blood was Mr. Rease’s. It is true that
the test did not demonstrate to a scientific certainty that the blood was
Mr. Rease’s. Indeed, as I understand mitochondrial DNA testing, it can
establish that a person is not a source, as it did with Mrs. Rease, but it
never establishes to a certainty that a person is the source of a sample.
M.M. Holland & T.J. Parsons, Mitochondrial DNA Sequence Analysis(Validation
and Use for Forensic Casework, 11 Forensic Science Review 31 (1999).

 A match may, however, yield a very high probability that a given
individual is the source of a sample. Williams has not provided any
meaningful analysis of this test result or its significance to his case.
Here the test did show that Mr. Rease’s profile was one of 65,536 that
matched the sample. Sixteen sites had nucleotides from two sources that
had been mixed. Because sixteen sites produced two nucleotides, 2 to the
16th or 65,536 possible profiles were matched. We are given no information
as to the frequency with which any of these profiles is found in any
population. Williams merely claims that this test casts “enormous doubt”
on the State’s case, but does not explain why this is true. Given that Mr.
Rease’s type is among the relatively small number of possible profiles
(65,536 out of an astronomical number), Williams has not shown why this
claim is correct. It is his burden to show a ground for overturning the
result reached by the trial court, and he has not done that. Moreover, as
explained below, on its face, the DNA evidence is less favorable to
Williams than the evidence at trial.

 As I see it, the DNA test is considerably less favorable to Williams
than what was presented at trial based on the then-current technology of
blood type matter. To the extent it is relevant, the DNA test showing the
blood to be from either Mr. Rease or Mrs. Rease would support the State’s
contentions. At trial the jury was told the blood was the same blood type
as both Mr. Rease’s and Mrs. Rease’s, and that type is found in 45% of the
general population. Blood from a type found in nearly half the population
is consistent with its source being Mr. Rease, but hardly persuasive on
that point. Williams attacked the blood evidence at trial by noting the
State’s failure to produce an expert to testify about how the blood came to
be on the shorts, and by pointing out that the blood could have come from
“millions of people” other than the victims or from some place other than
their house. T.R. at 2550, 2594-95 (quoted in Williams v. State, 706
N.E.2d 149, 156 (Ind. 1999)). The raw data from the DNA test seems to me
to be far more persuasive that the blood was from Mr. Rease, and therefore
that Williams was in proximity to the victims at the time they were
executed.

 In short, I was persuaded that a DNA test should be conducted because
it could exclude both Reases and if so would warrant reconsideration of the
death penalty. The test did not exclude both Reases and therefore did not
establish what Williams contended it would or could. I agree with the
majority’s analysis of the non-DNA evidence and therefore concur in the
result reached by the majority.

-----------------------
[1] Those documents are: (1) “Petition For Rehearing Regarding
Consideration of New Evidence” filed July 28, 2003, and “Reply To State’s
Response in Opposition To Petition For Consideration of New Evidence” filed
July 28, 2003; (2) “State’s Response In Opposition To Petition For
Consideration of New Evidence” filed July 28, 2003; (3) “Motion To
Supplement Record For Consideration of New Evidence Pursuant To 35-50-2-
9(k)” filed July 29, 2003; (4) “Supplemental Record & Supplement To
Motion To Reconsider Petition For The Consideration of New Evidence
Pursuant To Indiana Code 35-50-2-9(k)” filed September 4, 2003; (5)
“State’s Response To Petitioner’s Supplement To Motion To Reconsider
Petition For Consideration of New Evidence” filed September 19, 2003; (6)
“Second Supplement To The Record”” filed September 26, 2003; (7) “Reply To
The Court’s Order” filed March 29, 2004; (8) “State’s Verified Response To
Petitioner’s ‘Reply To Court’s Order’ and ‘Second Supplement To The Record”
filed March 31, 2004; (9) “Ex Parte Request For The Court’s Assistance To
Complete Investigation For Post-Conviction Proceedings By A Person Under A
Sentence of Death” filed March 20, 2004; (10) “Notice To The Court” filed
April 2, 2004; (11) “Notice To The Court & Request For an Extension of Time
Within Which To Respond To The State’s Reply” filed April 8, 2004; (12)
“Supplemental Motion To Reconsider Petition For Consideration of New
Evidence Pursuant To I.C. 35-50-2-9(k)” filed April 20, 2004; (13) “State’s
Verified Response To Petitioner’s ‘Supplemental Motion To Reconsider
Petition For New Evidence Pursuant To I.C. 35-50-2-9(k)” filed April 23,
2004; (14) “Motion For Leave To File Reply To State’s Response in
Opposition To Williams’s Supplemental Motion For Reconsideration of His
Petition For Relief Under I.C. 35-50-2-9(k)” filed April 28, 2004; (15)
“Reply To State’s Response in Opposition To Williams’s Supplemental Motion
For Reconsideration of His Petition For Relief Under I.C. 35-50-2-9(k)”
tendered April 28, 2004; “Request For Leave To Submit Additional Exhibit in
Support of Supplemental Motion For Reconsideration of Petition For Relief
Under I.C. 35-50-2-9(k)” filed May 11, 2004.